Davis, Judge,
delivered the opinion of the court:
These two separate appeals from the Indian Claims Commission arise out of the Treaty of May 10, 1854, 10 Stat. 1053, with the Shawnees; in both cases, the Commission held that the different claims the appellants prosecute are not covered by the Indian Claims Commission Act. 12 Ind. Cl. Comm. 161, 180 (decided March 22 and March 29, 1963)[1] .
In 1825, by the Treaty of November 7th, 7 Stat. 284, the Shawnee Nation relinquished to the United States all right to a large tract in Missouri given them by Spain. In return, the Federal Government granted the Indians either another area in Missouri or a tract on the Kansas Eiver (in territory which became the State of Kansas); the Shawnees chose the latter land and moved there. In 1831, a separate Ohio band of Shawnees agreed to move to this same area. 7 Stat. 355. By the Treaty of May 10, 1854, 10 Stat. 1053, the Kansas land was ceded to the United States and the United States contemporaneously ceded 200,000 acres back to the Shawnees for their homes. From this 200,000 acres, most of the Shawnees were to choose, in the order and manner prescribed by the treaty, individual tracts to be held in severalty. Certain members of the Tribe, known as Black Bob’s band, desired to continue to own lands in common, and special provision was made for them (including individual allotments if they should later desire them). Appeal No. 6-63 *513 involves Black Bob’s unit. Another initial exception from the immediate division of the 200,000 acres into - separate plots was for the absent Shawnees, members who had been for some years separated from the Tribe but might now return; certain lands were set apart, under defined■ conditions, to fill' their anticipated requirements.' These “absentee lands” are involved in Appeal No. 7-63. ■ Aside- from the lands for Black Bob’s group and for the absentee Shawnees, the 200,000 acres were divided in severalty and parcelled out to the various Shawnee families. There is no issue now before us relating to these so-called “severalty lands.” [2]
Appeal No. 6-63 (The “Black Bób” claim). — Article 2 of the 1854 Treaty contained this specific provision for Black Bo'b’s group (10 Stat. 1054-55) :
* * * In the settlement known as Black Bob’s Settlement, in which he has an improvement, whereon he resides ; and in that known as Long Tail’s Settlement, in which he has an improvement whereon he resides,- there are a number of Shawnees who desire to hold their lands in common; it is, therefore, agreed, that all Shawnees, including the persons adopted as aioresaid, and incompetent persons, and minor orphan children, who reside in said settlements respectively, and all who shall, within sixty days after the approval of the surveys hereinafter provided for, signify to the United States Agent their election to join either of said communities and reside with them, shall have a quantity of land assigned and set off to them, in a compact body, at each of the settlements aforesaid, equal to two hundred acres to every individual in each of said communities. * * :;:.[3]
Under this clause Black Bob’s band originally chose to hold their land in common, and over 33,000 acres were assigned for their use.
Appellants’ claim is that (i) the Black Bob band was driven from its common land by marauders during the Civil War, (ii) trespassers and squatters thereafter occupied the *514 area, (iii) even when peace returned, the United States failed adequately to protect the group’s possession of the land, thus rendering the Indians landless and destitute, (iv) in the late 1860’s and subsequently, the Federal Government improperly induced and allowed these Indians to select individual allotments from the group land and sell their individual tracts to white settlers for a nominal consideration,[4] and (v) as a result of these improprieties (including misfeasance by government agents) the Black Bob Indians were wrongfully deprived of their treaty land through this chain-process of selection, allotment, and sale.
Pointing to Article 4 of the 1854 Treaty which expressly authorized “those of the Shawnees who may elect to live in common” to make individual selections like those of the “severalty” Shawnees,[5] the Commission held that appellants were presenting individuals claims, not a group claim of the kind which alone is cognizable under the Claims Commission Act.[6]
We concur generally with the Commission in its ruling. All agree that individual claims, as contrasted to demands “on behalf of any Indian tribe, band, or other identifiable group of American Indians,” cannot be heard and determined under the Indian Claims Commission Act. See 25 U.S.C. §70a; Minnesota Chippewa Tribe v. United States, 161 Ct. Cl. 258, 271, 315 F. 2d 906, 913-14, Cherokee Freedmen v. United States, 161 Ct. Cl. 787. The main in *515 juries this proceeding seeks to redress are just such, individual losses to the separate members of Black Bob’s group who (we assume for this appeal) were caused to give up their individual allotments for less than fair value. The events appellants recount[7] involve alleged imposition and fraud on the various participants in the group who were wrongfully induced, it is said, to apply for allotments, make selections, and then sell the land to settlers and speculators. Precisely the same kind of claims could be presented, if the facts warranted, on behalf of the “severalty” Shawnees who made selections “in the first instance” after the 1854 Treaty, yet it is conceded that such suits by or for the “severalty” Shawnees would be individual demands beyond the jurisdiction of the Commission. Those claims would clearly depend upon proof of the special facts and circumstances pertinent to the particular “severalty” Shawnee. This is likewise true of the present case. As the Commission said in its opinion below (12 Ind. Cl. Comm, at 178-179):
* * * it would be necessary, if we had jurisdiction for this Commission to determine the extent of injury to each individual member of the Black Bob Band, to locate the particular tract of land which he selected, estimate its value in its natural state or at the time of the 1854 treaty, determine the consideration stated in the • deed and, more important, if that consideration were paid him and in what form. Each claim would be different as to the date upon which it arose, the value of the land, the consideration and the amount in money which patentee received for his lands. * * *
Appellants seek to ward off this assault through the defense that their claim must be considered a group one because the Black Bob lands were held in common and could not be allotted without the consent of the majority of the band. The inducement of individual members to seek allotments, it is argued, was a violation of the group’s common right in the tract. The great flaw in this position is that the treaty gave the right to request allotments, not to Black Bob’s band as a whole, but to the separate members, *516 when and as they individually desired. Article 4 (see footnote 5, supra)- stipulated that “those of the Shawnees who may elect to live in common, shall hereafter be permitted, if they so desire, to make separate selections within the bounds of the tract which may have been assigned to them in common.” Together with the Commission, we read this part of the treaty as giving the same personal allotment right to the Black Bob Shawnees as the “severally” Shawnees had. The treaty does not refer, in this connection, to Black Bob’s unit as a group (or to the other entity similarly situated); rather, it simply cites “those of the Shawnees who may elect to live in common,” a phrasing which seems to us to have a decidedly individual ring. There is little reason why a Shawnee who initially chose to live in common and then changed his mind should be barred from attempting to join the “severalty” party until he could persuade a majority (or perhaps all) of his group to do likewise. The whole tenor of the treaty favors individual allotments for those wanting them, and it is consistent to read the Black Bob clauses in that light. The appellants say that it would be difficult, burdensome, and preferential to carve out allotments for a few, when the rest of the band wished to continue to live in common. The treaty declares, however, that these selections “shall be made in all respects in conformity with the rule herein provided to govern those who shall, in the first instance, make separate selections.” Article 2 contains detailed provisions for the original “severalty” Shawnees, including the requirement that a selector choose' his own improvement on which he then resided, and methods by which families jointly occupying one improvement would make choices. These treaty rules (as supplemented by the Act of March 3, 1859, Ch. LXXXII, § 11, 11 Stat. 430-31) would seem sufficient to avoid the difficulties appellants raise as the major obstacle to reading Article 4 as granting the separate members of Black Bob’s band the right to apply for allotments.
We come back, then, to the point that — since the right to select was vested, personal, and individual — any wrongs done in inducing requests for allotment, or in the process of *517 selection, allotment, and sale, were individual and personal wrongs to the particular Shawnees who were bilked or defrauded. Improper inducement of an individual to exercise his right to an allotment might be an injury to him, but it would not trench upon any group rights; a fortiori the same can be said for improperly induced selections or sales. As a unit, Black Bob’s Settlement had no more interest in these transactions than did the entire Shawnee Nation in the process by which the “severalty” Shawnees acquired and sold their individual allotments. See Ponca Tribe v. United States, 6 Ind. Cl. Comm. 409 (1958). Even if we were to find the defendant guilty of all the nonfeasance and malfeasance the petitioners assert, we would have to hold that the victims were the individual Shawnees, not the group as such.
Implicit in some of appellants’ argumentation is the view that, at the least, the United States should be held liable because it failed to protect the Black Bob Band, while it still held all 'its land as a group, from being dispossessed during and immediately after the Civil War. The Commission has found (12 Ind. Cl. Comm, at 163, finding 8) : “During the early part of the Civil War, the members of the Black Bob Band were driven from their lands and such improvements as they had made were destroyed, and their stock stolen.' Some members of the band were killed and many of them fled the area for safety. When they returned after cessation of hostilities, they found their lands taken over to a great extent by white settlers.” It is clear that nothing less than heavy military assistance could have saved the band’s property. In view of the awesome conditions bedeviling, and the manifold pressures weighing on, the United States during the war, we would be presumptuous to hold that it broke an obligation to the Black Bobs by failing to divert the necessary troops in order to offer constant protection to their area against Quantrell’s raiders and the other marauder's in Kansas. Cf. Oneida Tribe of Indians of Wisconsin v. United States, decided this day, ante, p. 487, 499. The wartime eviction of the Black Bobs was one of the many collateral disasters of the great strug *518 gle; on tbe record made below, it was not a breach of faith or a culpable failure of federal responsibility. After the war, the Government did not move at once to displace the settlers effectively, but here too we see no breach in obligation during the short period from Appomattox to the latter months of 1866 (when the first Black Bob selections were made). Some leeway must be allowed for the re-gathering and re-direction of the nation’s depleted resources. In addition, negotiations were taking place at that time between the Shawnees (including the Black Bobs) and the Federal Government for the disposal of the Indians’ remaining lands in Kansas to settlers and others, so that the whole Shawnee Tribe could move to live with the Oherokees in Indian Territory. This treaty, made March 1, 1866, was ultimately rejected by the Senate in February 1869, but while it was pending the Government acted reasonably in preserving the status quo.[8]
In Appeal No. 6-63, our conclusion, therefore, is that the main part of appellants’ case represents a combination of individual claims not cognizable by the Indian Claims Commission; the lesser part of the case, the Government’s responsibility while the lands were all still held in common, must be rejected because there was no breach of obligation.
Appeal No. 7AH3 (The Olairn for “Absentee Shawnee Kansas” lands). — In establishing the Shawnee lands in Kansas, Article 2 of the 1854 Treaty also took care of the absent Shawnees, those “who have been for years separated from the tribe” (generally in the then Indian Territory) .[9] The surplus remaining “after provision is made for all present members of the tribe” was to be set apart,, in a compact body of land, for those absent Shawnees who returned within five years; they were entitled to seek allotments and *519 make selections like the initial “severalty” Shawnees. After the lapse of those five years, the remaining “absentee” lands were to be sold and the proceeds
retained in the treasury of the United States, until the expiration of ten years from the proclamation of this instrument, after which time, should said absent Shawnees not have returned and united with the tribe, all the moneys then in the treasury, or that may thereafter be received therein, as proceeds of the sales of such surplus lands, shall be applied to, or invested for, such beneficial or benevolent objects among the Shawnees, as the President of the United States, after consulting with the Shawnee Council, shall determine [10 Stat. at 1055.]
Any absent Shawnee who returned during the second five-year period would have the right to select any unsold land “and if all said lands have been disposed of, an equitable payment in money shall be made to them out of the proceeds of the said sales.”
Under these provisions, an expanse of over 24,000 acres was set apart for the Absentee Shawnees. For various reasons, including in some part the hostility of marauders and of white squatters, relatively few of this group actually returned to claim the allotments to which they were entitled; by the middle of 1867, only about 2,000 acres had been assigned. As the treaty contemplated, some of the absentee lands were sold (when the cessation of hostilities permitted such sales to be had) but by 1869 much still remained. White settlers had moved in and occupied most of the unallotted lands, and they clamored for the right to buy the particular tracts they were using. By Joint Resolution of April 7, 1869, 16 Stat. 53, Congress directed the sale of the remaining absentee tract to the settlers occupying the area, at $2.50 per acre. In June 1869, the Shawnee Tribe agreed with the Cherokees to affiliate with the latter and to pay $50,000 from the proceeds of the sale ordered by Congress. All the land was not sold at once, and in 1883 the Shawnee Council consented to purchases by settlers who came after the 1869 resolution; again, the proceeds were to be used for the benefit of the tribe.
*520 The present claim is for loss of the “absentee” lands alleged to have been disposed of to outsiders at less than fair value. As in the Black Bob case, Appeal No. 6-63, all the evidence is documentary. The Commission did not reach the issue of the value of the lands or the merits of a group claim on behalf of the Shawnee Nation itself. Confining itself to the claim on behalf of the Absentee Shawnees, the Commission held that under the 1854 treaty (a) those absentees who failed to return in time had no rights after the passage of the stipulated decade and therefore could not complain of the 1869 resolution, and (b) in any event, the claims were individual, not a group demand.
1. In deciding that the Absentee Shawnees have no claim on their own behalf, the Commission did not err. Even if the claim be deemed to have been a group one, such a cause of action no longer existed by 1869. The treaty explicitly gave the separated members a period of ten years from 1854, at most, in which to return, to unite themselves with the main body of the tribe, and to seek allotments (or the monetary equivalent, if they came back too late to obtain the land itself). That ten-year period ended in November 1864. The Congressional resolution, which appellant charges as the improper appropriation of the absentee lands, did not Come until 1869. By that time, under the express terms- of the treaty, the absent Shawnees no longer had any special fight or interest in the land or its proceeds. The treaty gave particular rights only to those separated brethren who returned within the prescribed period, not to the absentee Shawnees as a continuing group or to the absentees who stayed away. The “forfeiture” of the latter’s rights, declared by the 1869 resolution, was no more than a spelling out of the automatic consequences of the absentee provisions of the 1854 compact; in 1869, some fifteen years after the promulgation-of the treaty in November'1854, the only Indian entity concerned with the absentee lands (or their fruits) was the Shawnee Nation as a whole.
Appellant answers, first, that the absentees were prevented from returning by white hostility, as well as by a change in governmental policy, and should therefore not be estopped *521 by tlieir continued absence. The Commission found, however, that some 100 Shawnees did come back in 1862 and were informed of their rights, but decided after a council to return to Indian territory “where it was not so cold”; this finding is adequately supported. As for the absentees deterred by the fact that Kansas was a battleground of sorts during the Civil War, the United States, as we have pointed out in deciding Appeal No. 6-63, cannot on these records be saddled with the responsibility for the unauthorized outrages and spoliations in the Kansas of that era. It is said, in addition, that some absentees held back because the Federal Government changed its policy in the 1860’s and desired to have all the Shawnees move to Indian territory. If this were so, it would not be an adequate reason to by-pass the express treaty terms. The separated Shawnees were not compelled to stay in Indian country nor prevented from asserting their rights under the treaty; they chose to remain where they were and thereby voluntarily gave up their rights. To hold now that they nevertheless possessed special rights under the treaty would be to prefer them, without sufficient reason, over the other Shawnees whose rights in the absentee lands began after the ten-year span (see the discussion infra).
The second reason appellant offers for not applying the treaty as it is written is that neither the United States nor the “severalty” Shawnees considered the claims of the absentees under the treaty to have been ended by the .close of the ten-year period. We do not so read the documents appellant cites in support. Four are unratified treaties negotiated with the Shawnees (in 1862, 1864, 1866, and 1867), but never accepted by the Senate. Two of these abortive treaties were negotiated before the end of the ten-year period; one does not in any way purport to recognize for the future the special claims of the absent Shawnees; and the last (drawn up in 1867) seems to recognize that the absentee rights under the 1854 agreement had lapsed because it would provide that those rights shall continue to exist “as if they [the “Absentee Shawnees”] had availed themselves of such rights within the time limited.” Inoperative treaties of this type provide a poor basis for a *522 claim that the 1854 treaty was construed by the signatories to mean other than what the words say; it seems, rather, that the parties recognized the effect of the prior treaty and attempted to avoid that result by proposing a new and different agreement.[10]
As its final argument on this point, appellant calls upon New York Indians v. United States, 170 U.S. 1, 15-16, 19-20, 25-26 (1898), as a ruling contrary to our understanding of the 1854 treaty. That Supreme Court decision dealt with another agreement, worded quite differently and with a different history, and we find nothing in the opinion requiring us to construe our treaty so as to sustain appellant.
In sum, the unadorned terms of the 1854 treaty demand that we hold the absentee Shawnees to have lost all their special rights by the time Congress enacted its resolution of 1869 ■ ordering the sale of the residue lands at $2.50 per acre. Nothing in the history of the times warrants our extending the rights of the absentees beyond the decade given them by the treaty. Insofar as appellant sues on behalf of these absentees for the loss of the property in 1869, it has no valid claim and the Commission rightly dismissed it.[11]
2. We hold, however, that the Commission erred in dismissing, without consideration, that part of appellant’s claim in which The Absentee Shawnee Tribe sues on behalf of the entire Shawnee Nation. As shown by our earlier discussion of the absentee provisions of the 1854 treaty, the *523 Shawnee Nation as a whole was designated the residuary beneficiary of the absentee lands left unallotted (and their proceeds). This surplus was to “be applied to, or invested for, such beneficial or benevolent objects among the Shawnees, as the President of the United States, after consulting with the Shawnee Oownoil, shall determine” (emphasis added). The Shawnees, as a tribe or nation, therefore have a group claim based on the forced sale of the surplus absentee lands, under the 1869 resolution, at $2.50 per acre. If that amount was less than fair value, the tribe suffered a loss cognizable under the Claims Commission Act.
This claim was not decided by the Commission on its merits. • The Commission did not find that $2.50 was fair value;[12] ncr do we read the findings and opinions as deciding on the merits that for some other reason the Shawnees (as a whole)- now have no claim. There is some reference to the acceptance by the Shawnees of $50,000 coming from the sale of the surplus land, as well as to a “consent” by the Shawnee Council (in 1883) to further sales to settlers. But there is an issue whether these and comparable actions by the Shawnees were freely and competently done — -without fraud, duress, mistake, or imposition — and what they were intended to signify. A question of this kind, under the Claims Commission Act, should be gone into thoroughly (see, e.g., H.R. Rep. No. 1466, 79th Cong., 1st Sess. 11 (1945)). We do not believe the Commission has done so or that it thought it was passing upon the issue. That will have to bé done on remand, along with the valuation of the land.
The defendant urges us to reject appellant’s right to present a claim on behalf of the Shawnee Tribe because the original petition to the Commission did not state such a cause of action, limiting itself to a demand for the Absentee Shawnees alone. But the relevant facts were set forth in that petition, the opening statement below raised an alternative claim on behalf of the entire Shawnee Nation, and the *524 appellant’s briefs before the Commission put forth the same secondary claim. This was enough to bring the claim fully before the Commission. Miami Tribe of Oklahoma v. United States, 150 Ct. Cl. 725, 743-44, 281 F. 2d 202, 212-13 (1960), cert. denied. 366 U.S. 924 (1961).
The right of this appellant to represent the entire Shawnee Nation has already been established.[13] In the prior case involving the compensation paid under the 1854 treaty (see footnote 2, supra), the Commission found that “the Absentee Shawnee Tribe of Indians of Oklahoma, an organization recognized by the Secretary of the Interior, has the authority and capacity to maintain this claim under the provisions of the Indian Claims Commission Act for and in behalf of the descendants of the Shawnee Tribe or Nation (as it existed in 1854) as may be entitled to-participate in any recovery herein” (6 Ind. Cl. Comm, at 377), finding 1). The Commission’s opinion said: “Petitioner, The Absentee Shawnee Tribe, is an organized group recognized by the Secretary of the Interior (Pet. Ex. No. 286), and as such has the capacity to maintain this claim for and on behalf of such descendants of the Shawnee Tribe, conceded to be an identifiable tribe by defendant, who may be entitled to participate in any recovery herein” (6 Ind. Cl. Comm, at 397). The Commission’s decision was affirmed (with a modification not now relevant) by this court (151 Ct. Cl. 700 (1960)), and an award was made, in favor of the appellant, on behalf of the whole Shawnee Nation. We see no reason why this earlier determination that appellant can properly represent the Shawnee Nation as of 1854 does not also apply to the present case in which the appellant represents the Shawnee Nation with respect to events of the 1860’s (and later). During that period the absentee Shawnees formed a part of the entire tribe. In this very case the Commission said that (12 Ind. Cl. Comm, at 194) “there is no indication that they were considered a separate entity, but rather *525 wanderers from the fold of the Shawnee tribe. That they still considered themselves a part of the Shawnee tribe is borne ont by the fact that in 1862, when dispossessed by the fortunes of war, they returned to the protection of the Shawnee tribe proper, and the Shawnees shared their annuity with them.” It follows that appellant can pursue the claim of the Nation and that, if recovery is allowed, the entire Nation, including the appellant and its members, will participate ratably.
For these reasons, the order of the Indian Claims Commission in the case of the “Absentee Shawnee Kansas” lands must be reversed and the matter remanded for further proceedings. The Commission should permit the parties, if they desire, to reopen the record in order to present further evidence on the merits of the claim on behalf of the entire Shawnee Nation. That claim should then be determined on the basis of the entire record. We intimate no opinion whatever on the merits.

Affirmed in Appeal No. \6-63.

Reversed and remanded in Appeal No. 7-63.

 Appeal No. 6-63 was Docket No. 334-A before tbe Commission, and Appeal No. 7-63 was Docket No. 334-B.

 In earlier proceedings, the Indian Claims Commission a-warded a substantial sum on behalf of the Shawnees for the value of the lands ceded to the united States in 1854, over and above the consideration then paid. 6 Ind. Cl. Comm. 377 (Docket No. 334), modified and affirmed, 151 Ct. Cl. 700 (1960), cert. denied, 366 U.S. 924 (1961).

 The treaty goes on to provide for a census of those joining the two settlements.

 All of the Black Bob land was ultimately allotted. Sixty-nine members of the group made selections in the fall of 1866; a second batch of sixty-fiye selections followed; then came, at a later time, thirteen more selections; in the middle 1880’s the remainder of the tract was selected. During most of this period, there was controversy and dispute over the validity of the selections and the resulting patents. This history is summarized in the Commission’s findings.

 Article 4, 10 Stat. 1056, provided:
“Those of the Shawnees who may elect to live in common, shall hereafter be permitted, if they so desire, to make separate selections within the bounds of the tract which may have been assigned to them in common; and such selections shall be made in all respects in conformity with the rule herein provided to govern those who shall, in the first instance, make separate selections.”

 Aside from the nature of the claims they present, there is no issue as to appellants’ standing to sue under the Act. The Commission found that both the Absentee Shawnee Tribe and the Eastern Shawnee Tribe are tribal organizations with authority to represent the Black Bob group. The appellee does not contest this finding.

 They rely entirely on documentary exhibits; no oral testimony was taken below.

 In Blackfeather v. United States, 37 Ct. Cl. 233 (1902), aff'd, 190 U.S. 368 (1903), this court dismissed, as not a tribal claim, a petition seeking recovery for takings of personal property by white settlers from Shawnee lands, from 1861 to 1866. Congress later appropriated monies to satisfy these claims; despite appellants’ disavowal, it appears that at least some of the Black Bob claims (of that type and for that period) were included in those grants.

 The absent Shawnees left the body of the tribe about 1840 and settled, for the most part, on a tract in Indian Territory (now Oklahoma) which was purchased for them by the United States.

 The fifth document on which appellant relies is a letter, in June 1867, from the Commissioner of Indian Affairs to the Secretary of the Interior, regarding the sale of the absentee lands, in which the Commissioner suggested that the lands be valued by three appraisers, one selected by the Secretary, one by the Shawnee Council, and one by the Absentee Shawnees. This reference to the absentees, slight as it is, has even less force since the plan of sale was deliberately based on the unratified treaty of 1867, discussed in the text.

 In view of our discussion in Appeal No. 6-63, it is unnecessary to consider at length whether, in any event, this aspect of the present suit presents individual claims rather than a group claim. As in the case of the Black Bobs, the treaty gave the right to seek an allotment to the individual absent Shawnee, not to the band. Any loss, during the ten-year period, of land from which the selection was to be made would be an individual injury, not a wrong to the Absentee Shawnees as a unit. The land was not held in common by the Absentee Shawnees, but by the tribe as a whole. This secondary ground of decision disposes of appellant’s slight suggestion that the defendant committed wrongs, during the period from 1854 to 1864, for which the absentees can sue.

 Appellant claims that the series of unratified treaties, taken with other evidence, show that, at best, $2.50 should have been the minimum price and that the fair market value would have been higher.

 In the present case, the Commission found that the appellant is a duly organized tribe with authority and capacity to bring this claim, but no holding was made as to the appellant’s power to represent the Shawnee Nation as a whole.