Davis, Judge,
delivered the opinion of the court:.
The Seneca Nation, in the third of three cases under the Indian Claims Commission Act, 25 U.S.C. § 70a, involving the transfer of Indian land to others than the United States,[1] sues for indemnification for a tract in New York taken by that state by eminent domain in the middle of the last century. The claim was denied by the Indian Claims Commission. 12 Ind. Cl. Comm. 552.
The earlier history of the Seneca region of New York is *914 sketched in the two companion opinions (see fn. 1, supra) .[2] That territory was never part of the federal domain, but was largely disposed of pursuant to the Hartford Compact between New York and Massachusetts which assigned to the latter (and its grantees) the right to purchase and extinguish the Indians’ title. Excepted from the Seneca’s sale in 1797 to Robert Morris (Massachusetts’ grantee) was a mile-square tract, near the Allegany River, which has become known as the Oil Spring Reservation. This area remained with the Senecas.
About 1858 or 1859, the State of New York took by eminent domain a segment of 47.25 acres within this Reservation, to help in the construction of a state dam and canal system. Between 1863 and 1872, the state appropriated an additional 3.7 acres of the reservation for similar purposes. These takings were both made without any contemporaneous consent or, approval from Congress or from any federal officer or agency. New York paid $1,396.04 for the larger tract (including interest), a sum which appellant accepted without protest. There is no record of the payment, if any, for the 3.7 acres.[3] About 1912, the state abandoned this particular canal system and began to use the appropriated areas for recreation and conservation. In 1924, the Senecas sought to have New York declare that the land reverted to them on abandonment of the original use for which it was taken; the Nation also claimed rentals received by the state from vacationers’ use of the tracts. New York rejected these claims and has continued to assert full ownership of the land.
Appellant does not say that the price paid by New York for the 50 acres carved from the Oil Spring Reservation was inadequate or inequitable.[4] The claim is solely that the United States is liable for the value of the land simply be *915 cause federal officials have allowed New York’s taking to stand and have not acted to set the appropriation aside as illegally made without federal consent. Appellant’s theory is that the taking-without-approval contravened the Trade and Intercourse Act, 25 U.S.C. § 177 (see Seneca Nation v. United States, Appeal No. 14-68, supra), and that the Federal Government, as fiduciary, is responsible to the Senecas for not having proceeded to recapture the acreage (and its fruits) from the state.
The Indian Claims Commission disallowed this contention on the broad and controversial ground that the Trade and Intercourse Act is inapplicable to transfers to the State of New York,[5] but we place our affirmance on two narrower footings (without reaching the Commission’s point).
The first is that, if federal consent was needed under the Trade and Intercourse Act, such approval has been given. All agree that appellant would have no complaint if assent had been given at the time of the appropriations.[6] But approval can also come afterwards, and that is what happened here. In 1927, Congress provided that New York’s game and fish laws should thereafter apply to the Senecas’ Oil Spring Reservation (among others), except “that this Act shall be inapplicable to lands formerly in the Oil Spring Reservation and heretofore acquired by the State of New York by condemnation proceedings.” Act of January 5, 1927, ch. 22, 44 Stat. 932, 933. This explicit recognition and implicit ratification of New York’s ownership of the tract must be taken as Congress’s approval of the original appropriation, as well as of the state’s continued claim of right.[7] Cf. United States v. National Gypsum Company, 141 F. 2d 859, 863 (C.A. 2, 1944). Here, as in National Gypsum, “it is to be remembered that no contention has been made that *916 the * * * [takings] in question are in any respect inequitable.” That being so, there is no reason to disregard the subsequent acceptance and confirmation of the transfer.
The second ground of our affirmance is that, even if we were to assume that federal consent was needed and has never been given, we could not find that the Indian Claims Commission Act subjected the United States to liability for failing to take steps to recover the appellant’s land. The compensation paid by New York has not been attacked, nor is there any serious challenge (in this suit) to the New York view that, under its law, land taken for public use does not revert to the former owner upon abandonment of that use. There is, moreover, no evidence that the Senecas ever complained (prior to the commencement of these proceedings) to the Federal Government about the takings or sought to have the United States recapture the tracts or their value for the Nation. Even if we were to postulate that the United States had a special responsibility with respect to this land, we could not find a breach of obligation in a mere failure to move independently to set aside an equitable transfer which this beneficiary never brought to the Government’s attention and about which it never complained to the fiduciary. Appellant is not an infant or an incompetent, but an organized Indian tribe which took its own steps to protect its interests. Unlike its relationship to'some'other Indian groups, the. Federal Government was not in constant supervision over the Seneca Nation’s affairs and transactions. The standard of “fair and honorable dealings” did not require the United States, under these conditions, to take action on its own, under penalty of having to pay appellant (which has already .received just compensation) for the appropriated tract. “The measure of accountability depends, whatever the label, upon the whole complex of factors and elements which should be taken into consideration. The real question is: Did the Federal Government do whatever it was required to, in the circumstances * * *.? That is the standard.” The Oneida Tribe of Indians v. United States, 165 Ct. Cl. 487, 494 (1964), cert. denied, 379 U.S. 946. In this case, it has not been shown to our satisfaction that the Federal Government failed to do “whatever it was required to, in the circumstances.”
*917 We affirm the Commission’s determination on these grounds, without passing upon the other reasons discussed in the Commission’s opinion and reflected in certain of its findings.

Affirmed.

 The other two cases are The Six Nations v. United States, Appeal No. 8-63, ante, p. 899 and The Seneca Nation of Indians v. United States, Appeal No. 14-63, post, p. 917, both decided this day.

 By stipulation, the record in Seneca Nation v. United States, Appeal No. 14-63, is part of the record herein. The record in that appeal incorporates the record in Appeal No. 8-63.

 Appellant does not base any part of its case on the lack of proof that it was paid for these 3.7 acres.

 In contrast, Seneca Nation v. United States, Appeal No. 14-63, post, p. 917, and The Six Nations v. United States, Appeal No. 8-63, ante, p. 893, stress the alleged inadequacy of the consideration paid for the lands there inyolved. See, also, fn. 3, supra.

 The coverage of the Trade and Intercourse Act is discussed, generally, in Part II of the opinion in Seneca Nation v. United States, Appeal No. 14-63. As there indicated, two circuits have held the Act applicable to condemnations by the state, while the New York Court of Appeals and two district courts have taken the other position.

 It is settled that the United States could sanction and approve the condemnation of these Indian lands. Cf. Cherokee Nation v. Southern Kansas Ry., 135 U.S. 641 (1890); Seneca Nation v. Brucker, 262 F. 2d 27 (C.A.D.C., 1958), cert. denied, 360 U.S. 909 (1959). If the Trade and Intercourse Act applies, it does not bar the use of eminent domain but merely requires federal assent.

 Appellant’s demand for reverter had been made in 1924.