**GILA RIVER PIMA–MARICOPA IN-
DIAN COMMUNITY et al.**

**v.**

**The UNITED STATES.**

**Appeal Nos. 1–69, 2–69, 3–69.**

United States Court of Claims.

Feb. 20, 1970.

Z. Simpson Cox, Phoenix, Ariz., attorney of record, for appellant, Cox & Cox, L. J. Cox, Jr., Alfred S. Cox, George S. Livermore, Jr., David L. Cox, San Diego, Cal., Stephen L. Cox, Phoenix, Ariz., and Ira I. Schneier, Tucson, Ariz., of counsel.

David M. Marshall, Washington, D. C., with whom was Asst. Atty. Gen., Shiro Kashiwa, for appellee.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON APPEAL FROM THE INDIAN
CLAIMS COMMISSION

DURFEE, Judge.

This is an appeal from an order of the Indian Claims Commission dismissing appellant's petitions in Docket Nos. 236–K, 236–L and 236–M.

Appellant, the Gila River Indian Community, sued for itself and for and on behalf of members of the Pima and Maricopa Tribes of Indians.

The petitions, which were dealt with jointly by the Commission, asserted claims based on damages to the Tribe resulting from the Government's breach of its alleged general obligation as guardian of the Indians and from the breach of an obligation created by affirmative acts of providing Indian education, health services and administration. Docket No. 236–K alleged that damage was based on the Government's failure to provide adequate educational facilities, instructors and instruction in particular subjects. Docket No. 236–L alleged that damage was based on the Government's failure to provide adequate medical facilities and personnel to care for the health and safety of the appellant tribes. Finally, Docket No. 236–M alleged that damage was caused by the Government when it "undertook to, and did, subjugate petitioner under wardship to a stagnation of self-expression * * * [and] bridled petitioner into cultural impotency."

The basis of jurisdiction upon which appellant was relying before the Commission was the "fair and honorable dealings" section of the Indian Claims Commission Act, section 2(5), 25 U.S.C. § 70a (5) (1964).[1]

The Government moved for summary judgment on the grounds that all three petitions failed to state claims which are tribal claims,[2] and that all three petitions failed to state claims upon which relief could be granted.

The Commission assumed, for the purposes of passing on the Government's motion, that this was indeed a tribal claim. Nevertheless, it held that there was nothing in the legislative history of the Indian Claims Commission Act which suggested that claims this broad were intended to come within the broad grant of jurisdiction to the Commission. Gila River Pima-Maricopa Indian Community, et al. v. United States, 20 Ind.Cl. Comm. 131, 132 (1968). It also held that there could be no judicial establishment of a standard of care in providing these services. Id. at 134. The Commission did not find any specific acts of less than fair and honorable dealings, nor the violation of any statute, treaty or other agreement or obligation, but only conduct over an extended period of time which is alleged to have damaged the Indians. Id. at 132–3.

Petitioner is now before this court in order to establish its right to prove damages. We agree with the Commission that because the claims are not cognizable under the Act, the Commission does not have jurisdiction over this action. Before going further, however, we should first state that we do not agree with one

---

1. Section 2 is the jurisdictional section of the Indian Claims Commission Act, 25 U.S.C. § 70 et seq. (1964), and states in pertinent part:

   § 70a. Jurisdiction; claims considered; offsets and counterclaims.

   The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians, residing within the territorial limits of the United States or Alaska: * * * (5) claims based upon fair and honorable dealings that are not recognized by any existing rate of law or equity. * * *

2. Section 2 of the Act gives the Commission jurisdiction of claims against the United States on behalf of a tribe, band, or other identifiable group of American Indians. Individual claims, however, are not cognizable under the Act. See, e. g., Cherokee Freedmen et al. v. United States, 161 Ct.Cl. 787 (1963); Absentee Shawnee Tribe of Oklahoma et al. v. United States, 165 Ct.Cl. 510 (1964).

of the grounds for dismissal of the petitions as stated in its opinion:

> Even going so far to accept the theory of the petitions, we cannot find in the pleadings any setting out of a duty on the part of the defendant that is subject to judicial definition. Generally speaking we would assume that when defendant undertook to provide the various services it undertook to do no harm by them; the petitions do not allege an intent of the defendant to cause harm to the petitioner. But a Government cannot be a guarantor that beneficial results will always flow to a group from its furnishing of educational and health services and administration. Whether its obligation to the petitioner requires the exercise of "due care," or the "highest standard of care," *we hold that there can be no judicial establishment of a standard of care in providing these services*. [Emphasis supplied]. *Id*. at 134.

In the footnote to this portion of the opinion, the Commission cited Oneida Tribe of Indians of Wisconsin v. United States, 165 Ct.Cl. 487, 493–494, cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L. Ed.2d 544 (1964).

The important distinction is that in the *Oneida* case, *supra*, the court found that the Government did owe a duty, similar to that of a fiduciary, toward the Oneida Tribe under the "fair and honorable dealings" provision, section 2(5) of the Indian Claims Commission Act, in dealing with the reservation timber of the Tribe. Having found that there was this duty or obligation of the Government under the Act, the court then said:

> It is unimportant, in this case, to characterize that obligation precisely. Whether the responsibility be termed that of a guardian, a fiduciary, a trustee, a protector, or of a superior sovereign to a dependent people, the duty of care imposed upon the defendant would be the same. It would not reach the insurer's level nor fall to that of an outsider. The measure of accountability depends, whatever the

label, upon the whole complex of factors and elements which should be taken into consideration. The real question is: Did the Federal Government do whatever it was required to do, in the circumstances, to save the timber? *That is the standard*. [Emphasis supplied]. *Id*. at 494.

In applying the general standard, the court in *Oneida, supra*, relied upon further specific and established standards of evidence and law applicable to the case. However, the court decided that the Government had at least fulfilled its minimum obligation to the Tribe, and concurred with the dismissal of the Oneida petition by the Indian Claims Commission.

■ In the present case, we find that there was no duty of the Government to perform the specific obligations alleged in the petitions. But we are not prepared to agree with the statement of the Commission that "even going so far as to accept the theory of the petitions, we cannot find in the pleadings any setting out of any duty on the part of the defendant that is subject to judicial definition" and its further statement that "there can be no judicial establishment of a standard of care in providing these services." If we were to accept the theory, as alleged in the petitions, that there is a *duty of the Government as a guardian to adequately provide the specific services* which petitioner alleges it undertook to perform for them, there could then be judicial establishment of a standard of care for the Government in providing these services, just as this court did in *Oneida, supra*.

The Commission, in questioning what standard could be used to define the extent of defendant's duty, used education as an extreme example of the insoluble problems to be encountered in attempting to define the scope of defendant's duty.

Nevertheless, our Supreme Court, once having determined the constitutional duty of state and local governments to provide adequate educational facilities, has thereupon judicially established a stand-

ard of care required in providing these facilities.

In Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950), the Supreme Court found that a law school established by the State of Texas for Negroes did not provide them with educational opportunities equal to those offered by the State to white students of the University of Texas. In arriving at this conclusion, the Court stated, at pp. 633–634, 70 S.Ct. at p. 850, "\* \* \* In terms of number of faculty, variety of courses and opportunity for specialization, size of student body, scope of the library, availability of law review and similar activities, the University of Texas Law School is superior. \* \* \*" These were standards judicially determined to test whether the Negro petitioner had received his full constitutional right to legal education equivalent to that offered by the State to students of other races.

In Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court in determining that the segregation of children in public schools solely on the basis of race deprived the children of the minority group of equal educational opportunities, cited *Sweatt, supra.* The Court relied upon certain "intangible considerations" which are nevertheless judicial standards for equal educational opportunities.

Certainly the standards which could be required in this case would be different and perhaps more difficult to establish than the judicial standards for equal education adopted by the Supreme Court under constitutional requirements. If the theory of the petitions as to the duty of the Government to provide the services alleged in the petitions is accepted for the purpose of argument, and it was accepted by the Commission on this question, then petitioner should have been allowed to try to meet this burden of proof of law and fact required to establish satisfactory standards for the objective measurement of the degree of care required, and for the measurement of money damages, rather than dismissal of the petition because "there can be no judicial establishment of a standard of care in providing these services."

■ We now turn to the claim by petitioner that the Government failed in its obligations as guardian of the Indians in three specific respects. Since this precise type of claim has not, to our knowledge, been previously brought for adjudication, we must examine the legislation and its history to make an initial determination.

The legislative history of the Act has been chronicled in Otoe and Missouria Tribe of Indians v. United States, 131 F. Supp. 265, 131 Ct.Cl. 593, cert. denied, 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955). In the course of his learned opinion, Judge Littleton made the following remarks:

The Indian Claims Commission Act is both remedial legislation and special legislation. It broadens the Government's consent to suit and as such is in derogation of its sovereignty. It confers special privileges upon the Indian claimants apart from the rest of the community, and to some extent is in derogation of the common law. This was, we think, because of the peculiar nature of the dealings between the Government and Indians from very early times. On the other hand, it remedies defects in the common law and in pre-existing statutory law as those laws affected Indians, and it was designed to correct certain evils of long standing and well known to Congress. Fortunately, under these circumstances, rules of interpretation and construction are subordinate to the principle that the object of all construction and interpretation is the just and reasonable operation of the particular statute, and accordingly it should be possible to construe the statute liberally to affect its remedial purpose and intent, and strictly to limit undue abrogation of fundamental rights or to prevent undue extension of extraordinary remedies. *Id.,* 131 F. Supp. at 271, 131 Ct.Cl. at 602.

One of the extraordinary remedies provided for in this Act was the cause of action based on "fair and honorable dealings" in section 2(5). While the remedial purpose and intent of that section should be effectuated, its scope should not be unduly extended. With this caveat in mind, appellant's allegations can be analyzed, both as to their inherent validity and as to their relationship to section 2(5).

Appellant fails to indicate the source of the alleged guardianship obligations of the Government. The crucial question is how, or in what manner, did the Government undertake the role of guardian, and its concomitant obligations?

Appellant admits that there was no treaty, agreement, order or statute which expressly obligated the United States to perform these services. This, we feel, is fatal to appellant's case. As we have stated before, in a case dealing with this very tribe:

> Whether or not the legal relationship of guardian and ward exists between a particular Indian tribe and the United States depends, we think, upon the *express provisions* of the particular treaty, agreement, executive order, or statute under which the claim presented arises. It is true that the word "fiduciary" and the expression "guardian-ward relationship" have been used by the courts to describe generally the nature of the relationship existing between the Indians and the Government. However, in the absence of some language in a treaty, agreement or statute spelling out such a relationship, the courts seem to have meant merely that the relationship between the Indians and the Government is "similar to" or "resembles" such a legal relationship and that doubtful language in the treaty or statute under consideration should be interpreted in favor of the weak and dependent Indians. * * * [Emphasis supplied]. ` Gila River Pima-Maricopa Indian Community et al. v. United States, 140 F.Supp. 776, 780–781, 135 Ct.Cl. 180, 189 (1956).

Here of course, there is no language which we could construe as creating a guardian-ward type relationship even under liberal rules of construction. Accordingly, appellant cannot prevail on this argument.

■■ Appellant contends that there is another basis for the Government's obligation—the affirmative acts of providing education, health services and administration. In its petitions before the Commission, appellant alleged that the Government undertook, by an affirmative course of action for many years to provide certain services. It undertook, it is alleged, to provide appellant with an adequate educational system, but instead provided incompetent and inadequate facilities and methods, and failed to teach the necessary knowledge of certain agricultural skills, Indian arts, language and culture, and ideas and ideals of self-government, domestic science, business methods and practical trades (Docket No. 236–K). It is also alleged that the Government undertook to provide, control and administer sufficient medical, dental and sanitation facilities, but instead, did not provide adequate facilities, and has provided personnel who were without proper training, understanding and ability to adequately care for petitioner, and who, in fact, did not properly care for petitioner (Docket 236–L). Finally, it is alleged that the Government undertook, as guardian, to shelter, protect and shield the Indians from all wrongful, unlawful and unconscionable acts of all third persons, but instead, subjugated the Indians under wardship (Docket 236–M).

Appellant characterizes the alleged failure to maintain *adequate* educational and health facilities as "wrongful conduct" or "maladministration." These words do not in and of themselves lead us to a solution. "The measure of accountability depends, whatever the label, upon the whole complex of factors and elements which should be taken into consideration. The real question is: Did the Federal Government do whatever it was required to do, in the circumstances,

* * * ? That is the standard." *Oneida, supra,* 165 Ct.Cl. at 494.

As we have already stated, the United States did not assume any obligation as a guardian here. Moreover, there was no other special relationship or obligation here which created liability on the part of the United States. There have been a number of cases where this court has called the relationship between the Government and the Indians a "special" relationship, and the court thereby found that the Government owed an obligation. Each case rested on its own facts, and in our view, the facts and circumstances in this case did not create any "special" relationship.

In the case of Lipan Apache Tribe et al. v. United States, 180 Ct.Cl. 487 (1967), the court, on appeal from a dismissal by the Indian Claims Commission, reversed and remanded the case to the Commission to determine if any special relationship had been created. In discussing whether the United States could be held liable under the "fair and honorable dealings" section of the Act, the court stated that " * * * The required nexus for liability could rest upon * * *an established special relationship* between the Government and the claimant Indians affecting the controverted subject matter. * * * " [Emphasis supplied]. *Id.* at 502. The established special relationship which the court thought could provide the nexus was a series of treaties between the United States and the tribes bringing suit. By these treaties, the Indians acknowledged either that they were under the protection solely of the United States, or that they submitted to the power and authority of the United States. *Id.* at 500–501.

It can therefore be seen that more is needed to create such a "special relationship" than mere "affirmative actions." This is borne out by the final paragraph of the *Lipman Apache* opinion, *supra:*

> The tribes insist that the United States, by statutes, treaties, and representations of its agents, undertook to protect their occupancy rights from

the alleged encroachments. It is essential, therefore, to determine if a special relationship was created; the nature and scope of any responsibilities assumed by the United States; and whether the Federal Government met these obligations. * * * *Id.* at 502.

Thus, the court realized that a special relationship could be created, but based this conclusion on the possible existence of statutes, treaties or representations. Affirmative acts such as those allegedly undertaken in our case may lead to liability if they are indeed less than "fair and honorable," and if there is a duty owed; they do not, in and of themselves, create that duty.

Special relationships may also be present when the Government supervises the affairs and transactions of the Indians. This is closely akin to the guardian-type or fiduciary-type relationship discussed previously. In Seneca Nation of Indians v. United States, 173 Ct.Cl. 912 (1965), the tribe based its claim partially on the ground that the Federal Government, as a fiduciary for it, was responsible for not having recaptured a tract of land taken by New York State by eminent domain. Although in that case the action was brought for the Government's *failure* to act, the court reasoned that absent the special relationship, there was no obligation to act, under the "fair and honorable dealings" section. The crux of the situation was that the tribe had not shown that the Federal Government had failed to do "whatever it was required to, in the circumstances." *Id.* at 916. Similarly, appellant has not shown us that the Government has failed to do "whatever it was required to, *in the circumstances.*" [Emphasis added].

Had appellant adduced any facts or evidence which would have given even the slightest indication of an agreement with the Government, we might have been able to find an obligation. In that event, we might have been more willing to order a trial, to determine whether that obligation had been breached, the standards of care required and the mea-

surement of damages. However, appellant has not aided the court in this respect, and we must therefore presume that there was no basis for an obligation.

■ At oral argument, appellant made the contention, albeit not fervently, that its situation was akin to the "Good Samaritan" cases. We need not consider the merits of this characterization, since any claim which would fall under the "Good Samaritan" rules would be brought under § 2(2) of the Indian Claims Commission Act, 25 U.S.C. § 70a (2). That section encompasses claims sounding in tort, while the claim before us has been brought under the "fair and honorable dealings" section.[3]

While we recognize that Congress wished to make the Commission's jurisdiction as broad as possible, we must be cognizant of the fact that the jurisdictional section of the Act is a synthesis of those " * * * classes of cases * * * which have heretofore received congressional consideration in the form of special jurisdictional acts. * * *" H.Rep. No. 1466, 79th Cong., 1st Sess., (1945) p. 10, U.S.Code Cong.Serv. 1946, p. 1356.[4] And, as has already been mentioned, this particular claim is one of first impression. Hence, it is reasonable to conclude that, despite the broad range of claims intended to be included in the Act, this particular claim was not among them.

We agree with the Commission " * * that the petitions state complaints that may well reflect a valid criticism of one-time governmental policies * * * [which] may be redressed through the

political process * * *." 20 Ind.Cl. Comm. at 135–36.[5]

We also concur with the conclusion of the Commission that the petitions do not state causes of action cognizable as claims under the standards of jurisdiction set forth in the Indian Claims Commission Act. Therefore, the appeal is denied, and the decision of the Commission is affirmed.

Affirmed.

DAVIS, Judge (concurring):

Throughout the nation's history there have always been some individuals, usually but a handful, who have been sensitive, in the large, to the injuries done to the Indians' interests and way-of-life by our course of westward settlement. The number of the concerned has been growing and, over the years, there have been various efforts at some sort of redress. The Indian Claims Commission Act of 1946 is a major reflection of this trend. In recent years recognition of the total shape of the harm done by our national Indian policy has become both deeper and more widespread. But it would be wrong for judges to read into the Indian Claims Commission Act, passed almost twenty-five years ago, currents of thought which are emerging today but were not infused into that 1946 statute. The Act was not designed to grant compensation for all the detriment accruing to the Indians by our ongoing policy toward them but, rather, had the more limited goal of paying for specific deprivations of land or property or rights protected by treaty,

---

3. The language of Section 2(5) indicates that "fair and honorable dealings" provides a yardstick for claims which would not otherwise fall within established legal or equitable principles. Thus, if in fact, appellant's claim is similar to a "Good Samaritan" claim, then the claim would not be encompassed by Section 2(5). Of course, we mention this only in passing, and make no judgment as to the validity of appellant's claim if it were couched in terms of a tortious action.

4. This report accompanied H.R. 4497, which was eventually enacted with minor

changes into the Indian Claims Commission Act.

5. The legislative history of the Act indicates that Congress was aware that some new type of case may arise in the future which would not be covered by Section 2. Thus, H.Rep.1466, *supra*, p. 10, stated: " * * * If any class of claims is omitted, we may be sure that sooner or later that omission will lead to appeals for new special jurisdictional acts. * * *" U.S.Code Cong.Serv.1946, p. 1355.

statute, or then-existing law. The instances cited in the Congressional history are of that kind. There is no intimation at all in the legislative background that the "fair and honorable dealings" clause was a catch-all allowing monetary redress for the general harm —psychological, social, cultural, economic—done the Indians by the historical national policy of semi-apartheid.

To the extent they escape the prohibition against claims for individual injury,[1] appellant's petitions seek a remedy for the generalized harm which the Claims Commission Act does not cover. The complaint is that the Federal Government has destroyed Indian peoplehood by failing to provide proper education, medical care, and self-government. This is a charge which could undoubtedly be brought by all Indian tribes and groups, but it is significant that appellants are the only ones who have sought to make it under the 1946 Act. That type of generalized "reparations" for a traditional policy, accused of aborting Indian development, Congress has not yet granted.

I do not join the court's discussion, in the latter part of its opinion, of guardianship and "special relationship" because I do not believe that that is the nub of the problem before us, and also because I would avoid the danger that that rationale could be misused in the future to deny recovery for claims for specific injuries truly redressable under the Claims Commission Act. My position is that, even if a "special relationship" did exist as to the matters on which petitioners sue, Congress did not intend in this Act to give redress for that type of injury. I do agree, however, with the court's rejection, in the first part of its opinion, of the Commission's holding that there can be no judicial establishment of a standard of care in providing educational, health, and governmental services.

NICHOLS, Judge (concurring).

I join in the opinion of the court and in the concurring opinion of Judge Davis.

In addition to both, I would like to point out that in using the word "claims" five times in Section 2 of the Act, to designate five classes of cases over which the Commission would have jurisdiction, the Congress was not using a novel or freshly coined word. "Claim" is a word of art and it does not include, for instance, every case or controversy that may arise between a citizen and the United States, e. g., Tracy v. Gleason, 126 U.S.App.D.C. 415, 379 F.2d 469 (1967); United States v. Bergson, 119 F.Supp. 459 (Dist.Ct.D.C.1954). Thus, when the House Committee said, as quoted by plaintiff:

> * * * it is essential that the jurisdiction to hear claims which is vested in the Commission be broad enough to include all possible claims. If any class of claims is omitted, we may be sure that sooner or later that omission will lead to appeals for new special jurisdictional acts. * * *

U.S.Code Cong.Serv. 79th Cong., 2d Sess. (1946) at pp. 1355–1356, it did not mean that the Commission was to be the arbiter of every possible dispute that might have arisen between the United States and the Indians in 170 years of history, or that it was to settle every grievance. The Congress did not in 1946 intend to fasten upon the administration of Indian affairs the system of Government by litigation that so many of our citizens seem to be coming to believe in today.

---

1. In the process of legislative consideration of the measure which ultimately became the Indian Claims Commission Act, a prominent spokesman for the Indians (Mr. Ernest Wilkinson) twice objected, in their behalf, to allowing the Government's educational expenses as offsets to awards, on the ground that such educational expenses were largely for individual rather than tribal benefit. See Hearings on S.3083, 76th Cong., 3d Sess. (1940), p. 83; Hearings on H.R.4496, 79th Cong., 2d Sess. (1946). The Act bars the offset, among other things, of "agency or other administrative, educational, health" expenses, 25 U.S.C. § 70a.