SENECA NATION OF INDIANS,
Plaintiff,

United States of America,
Plaintiff–Intervenor,

v.

STATE OF NEW YORK, George Pataki, as Governor; Joseph Seymour, as Commissioner of General Services; Bernadette Castro, as Commissioner of Parks, Recreation and Historic Preservation; Joseph and Susan Chiapuso; Howard B. Whitney Estate; Walter L. Whitney; Jane E. Schuck; Kent Sandford; Richard J. and Beverly A. McCutcheon; Albert A. and Lucy Hoffman; Myles and Sandra Barraclough; Duane G. Glover; Paul H. and Virginia M. Geer; Deborah H. Baldwin; Robert L. and Eugenia Jones; Stephen M. Kane; Scott E. and Rosemary N. Fisher; William A. Campbell; David J. Gibson; Clarence J. Coffman, Sr.; Clarence J. Coffman, Jr.; C. James Coffman, Sr., and Jean Coffman;

Eileen W. Garling; Robert F. and Susan F. Van Der Horst; Howard and Florence Luzier; Eugene and Lousie Hickey; Phillip and Shirley Confer; David C. and Frances E. Williams; Kenneth Campbell; Frederick Tapp; Susan Bunker, Defendants.

No. 85–CV–411C.

United States District Court,
W.D. New York.

Oct. 31, 1998.

Jeanne Whiteing, Boulder, Colorado, Arlinda F. Locklear, Jefferson, Maryland, for plaintiff.

United States Department of Justice, Environment & Natural Resources Division, Indian Resources Section (Ann C. Juliano, of counsel), Washington, D.C., for plaintiff–intervenor United States.

Dennis C. Vacco, Attorney General of the State of New York (David B. Roberts, Assistant Attorney General, of counsel), Albany, New York, for defendants.

## DECISION and ORDER

CURTIN, District Judge.

President Washington … met with Cornplanter, Chief of the Seneca Nation, shortly after the enactment of the 1790 [Indian Nonintercourse] Act.[1] They discussed the Senecas' complaints about land transactions, and Washington assured them that the new statute would protect their interests. Washington told Cornplanter:

> "Here, then, is the security for the remainder of your lands. No State, nor person, can purchase your lands, unless at some public treaty, held under the authority of the United States....
>
> \* \* \* \* \* \*
>
> "If … you have any just cause of complaint against [a purchaser] and can make satisfactory proof thereof, the federal courts will be open to you for redress, as to all other persons."[2]

## BACKGROUND

The Seneca Nation of Indians ("Senecas") bring the present action seeking a declaration that certain lands on the Senecas' Oil Spring Reservation were illegally appropriat-

ed by the State of New York ("State") in violation of the Senecas' treaty rights and in violation of the Indian Nonintercourse Act, 25 U.S.C. § 177,[3] and that the transactions involving these lands are therefore void. In addition to declaratory relief quieting title in the various parcels described in its Second Amended Complaint (Item 58), the Senecas seek injunctive relief to prevent the State and any of the named defendants from selling the parcels at issue, damages for the State's alleged trespass to the land, and the ejectment of the individual defendants currently residing on the disputed land (Item 58).

The defendants include the State, the Governor, several State Executive Department officers, and numerous private parties leasing cottage lots on the disputed land from the State. The individual defendants are represented by the State Attorney General's Office; consequently, in this order when the court refers to the State's arguments, the individual defendants are included.

After the suit was filed, extensive settlement negotiations followed without success. Finally, on August 26, 1994, both the Senecas and the defendants filed cross-motions for summary judgment (Items 68 and 69). The parties thoroughly briefed their arguments and submitted affidavits with extensive exhibits. The court did not proceed to decision and issued a stay on August 13, 1996 (Item 102), because the Supreme Court granted *certiorari* in a case raising similar issues, *Coeur d'Alene Tribe of Idaho v. Idaho*, 42 F.3d 1244 (9th Cir.1994), *cert. granted*, 517 U.S. 1132, 116 S.Ct. 1415, 134 L.Ed.2d 541 (1996). After the Supreme Court decided *Idaho v. Coeur d'Alene*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), on July

---

1. The Indian Nonintercourse Act was enacted by the first Congress in 1790 and has been reenacted in substance by subsequent Congresses to the present date. It is also referred to as the "Trade and Intercourse Act." This court, like the Supreme Court, will refer to it as the "Nonintercourse Act."

2. *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 237–38 n. 8, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) ("*Oneida II*") (quoting 4

American State Papers, Indian Affairs, Vol. 1, at 142 (1832)).

3. 25 U.S.C. § 177 states in relevant part:
 No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution … under the authority of the United States.

10, 1997, the court set a new briefing schedule.

On August 20, 1997, the United States filed a motion to intervene (Item 105), which the court granted on January 29, 1998 (Item 120). The United States' complaint in intervention (Item 125) seeks to enforce the provisions of the Nonintercourse Act for the benefit of the Senecas and seeks the identical relief as the Senecas' Second Amended Complaint. The United States submitted a motion for summary judgment on August 26, 1997 (Item 109), before the court permitted the government to intervene, in order to comply with the established briefing schedule.

On July 17, 1998, the court heard oral argument on the cross-motions for summary judgment.

### FACTS

The Seneca Nation is a federally recognized tribe that owns the Oil Spring Reservation located in Cattaraugus and Allegany Counties, New York. The Senecas reserved the one-mile square reservation to themselves under the Treaty of November 11, 1794, 7 Stat. 44, between the United States and the Six Nations, of which the Senecas were a member. These lands were reconfirmed to the Senecas under the Treaty of September 15, 1797, 7 Stat. 60, between Robert Morris and the Senecas, a treaty approved by the United States. Under the 1797 Treaty, the Oil Spring Reservation consisted of 640 acres.

In 1858 and the years that followed, the State took possession of the land at issue in this litigation, together with adjacent lands owned by non-Indians through its power of eminent domain as part of a project to construct a dam which would provide water for the Genesee and Erie Canals. The Senecas contend that the State took approximately 47.25 acres belonging to them for this project (Item 71, ¶ 8). Of the 47.25 acres, the State took 13.19 acres for the Oil Creek Reservoir, today known as Cuba Lake, and 2.2 acres for construction of a new road along the reservoir. These parcels form the basis for Count I of both the Senecas' Second Amended

Complaint and the United States' Complaint in intervention.

The Senecas allege that the rest of the 47.25 acres were taken by the State as follows: (1) 2.36 acres for the excavation of an outlet from the reservoir; (2) 26.96 acres that the State anticipated would be damaged and flooded by the construction of the reservoir; and (3) 2.53 acres for the deposit of soil from the construction (Item 58, ¶ 37; Item 71, ¶ 9). These parcels form the basis for Count II of both the Senecas' and the United States' complaints. With respect to the 26.96 acres, the State submits that it never took possession of the 26.96 acres; but rather, it had an easement allowing it to flood those acres (Item 86, ¶ 8).

In the years that followed the initial construction of the reservoir, the State passed Chapter 342 of the Laws of 1863, authorizing additional appropriations to raise the water level of the reservoir an additional three feet (Item 69, ¶ 10; Item 86, ¶¶ 9, 11, 14). According to the State, when the water level was raised in accordance with this authority, additional acreage within the reservation was taken (Item 59, ¶ 11). The State asserts that the precise acreage and location of lands flooded when the reservoir level was raised are difficult to ascertain; however, it notes that the Indian Claims Commission ("ICC") found that the appropriation was 3.7 acres (*Id.,* ¶¶ 12–13). The State has identified part of the land it believes was appropriated pursuant to Chapter 342 of the Laws of 1863 (Item 73, Exh. 11, Attachment 1).

The Senecas dispute the State's contentions about this second appropriation (Item 84, ¶¶ 2, 7–8), contending that while the reservoir was raised three feet in about 1864 pursuant to Chapter 342, it was raised an additional six feet in 1869 and an additional two feet in 1872 pursuant to other authorities (*Id.,* ¶ 7). The Senecas assert that there is no evidence that the possession of additional reservation lands was the result of the raising of the reservoir in 1863 pursuant to Chapter 342, and the logical inference to be drawn from these facts is that the additional taking was the result of the last raising of the reservoir in 1872 (*Id.*). The Senecas insist that neither the ICC nor the Court of

Claims made binding findings of a later appropriation of 3.7 acres (*Id.*, ¶ 9).

The Senecas contend that the State took additional lands within the reservation after 1858. In particular, they assert that the State took possession of approximately one acre of land for the purpose of constructing a new road along the reservoir. This parcel forms part .of the basis for Count III in both the Senecas' and United States' complaints.

The State Canal Commissioners appropriated the land by a process known as inverse condemnation, by which they entered upon the land and took it without first instituting a condemnation proceeding. Under such a process, the landowner whose land was appropriated could petition court-appointed land appraisers for compensation. NY Rev. Stat., Tit. IX, Arts. 2 & 3 (Weed, Parsons & Co., 2d ed., 1869) (Item 73, Exh. 23). The Senecas brought such a petition, and in a decision dated June 23, 1865, the canal appraisers awarded it $1,319.89 in damages and six years' interest for lands previously appropriated (Item 73, Exh. 11, Attachment 9). The parties disagree as to whether this award was solely compensation for the 47.25 acres appropriated in 1858, or whether the award also encompassed the disputed subsequent appropriations described above. The Senecas contend that there were never any judicial or administrative condemnation proceedings for any of the alleged takings after 1858 (Item 71, ¶ 14; Item 72, at 23–25; Item 84, ¶ 2).

In about 1878, the State abandoned the Genesee Valley Canal but continued to use the reservoir as part of the Erie Canal system until about 1892 when it also abandoned that use (Item 69, ¶ 16). According to the Senecas, by the early 1900's squatters had begun to erect cottages along the shores of Cuba Lake, and approximately 150 cottages had been erected by 1913 (Item 58, ¶ 47). In 1913 and 1914, the State divided the lakefront property into numbered lots and leased the lots. The Senecas allege that some of the lots lie entirely within the original boundaries of the Oil Springs Reservation which the State did not purport to appropriate in 1858, and portions of other lots lie within the reservation (Item 69, ¶¶ 48–49; Item 71,

¶ 12). According to the Senecas, the State appropriated approximately 2.5 acres of reservation land in this manner and leased it to private individuals. The State contends that with the exception of a small acreage lying outside the claim area, these lots are located entirely within the 47.25 acres acquired by the State in 1858. These parcels form part of the basis for Count III of the Senecas' and the United States' complaints.

In January 1924, the Senecas submitted a formal petition to the Commissioners of the New York Land Board seeking a determination of its rights to the Oil Spring property (Item 83, Exh. 31). It contends that its petition sought the return only of the lands appropriated by the State in 1858, for which an award was made in 1865 (Item 84, ¶ 11). In their petition, the Senecas claimed that the lands reverted to them when the use for which the lands had been taken was abandoned. They also claimed that they were entitled to the rents realized by the State from cottage lots rentals on the subject property (Item 83, Exh. 31).

The New York State Attorney General advised the Commission that the appropriation of the lands was valid because: (1) under the laws of New York, land taken for public use did not revert to the former owner upon abandonment of that use; (2) the statute of limitations was a bar to the claim in the same manner as in the case of a citizen; and (3) the Senecas, having been compensated, had no moral right to the title nor to the monies collected from the rents. The Commissioner followed the recommendation of the Attorney General and denied the petition (Item 69, Exh. B, ¶¶ 24–25) (citing *Seneca Nation of Indians v. United States*, 12 Ind.Cl.Comm. 552, 559–60 (1963)).

On January 5, 1927, Congress enacted a statute that granted the State jurisdiction over fishing and hunting on certain Seneca lands. The 1927 Act states in relevant part:

[T]he laws of the State of New York (including laws hereafter enacted) relating to the taking of game and fish shall be applicable to the taking of game and fish within the Allegany, Cattaraugus, and Oil Spring Indian Reservations in the State of New York; except that—. . .

(3) ... this Act shall be inapplicable to lands formerly in the Oil Spring Reservation and heretofore acquired by the State of New York by condemnation proceedings.

Act of Jan. 5, 1927, Ch. 22, 44 Stat. 932 (Item 73, Exh. 15).

On September 14, 1960, the Senecas filed a Second Amended Petition before the ICC, in which it claimed that the United States had failed and neglected to aid and assist the Senecas in recovering the land that is the subject of the present action (Item 69, Exh. A). The Senecas sought money damages due to the United States' failure in its treaty obligations and duties as guardian to protect the petitioner in its rightful possession and use of its lands and to preserve and maintain the Senecas' title. The ICC found as a matter of fact that the State appropriated 47.25 acres in 1858 or 1859 and 3.7 acres sometime between 1863 and 1872 without any grant of authority, consent, or approval of Congress or any officer or agency of the federal government. *Seneca Nation I*, 12 Ind.Cl.Comm. at 558 (Item 69, Exh. B). The ICC also found that the lots that the State had rented after 1913, with the exception of a small acreage, were located entirely within the 47.25 acres acquired by the State in 1858. *Id.* at 560.[4] The ICC found that the United States was under no fiduciary duty or obligation to protect the Senecas' interest in the subject lands because the Nonintercourse Act did not apply to transfers of Indian lands to the State of New York. *Id.* at 563–569.[5]

The Senecas appealed the ICC's decision to the United States Court of Claims. The Court of Claims affirmed the ICC's decision on two separate grounds: (1) the appropriation did not violate the Nonintercourse Act because Congress had ratified the taking in the 1927 Act; and (2) the Indian Claims Commission Act does not subject the United States to liability for failing to take steps to recover the land since the Senecas never attacked the compensation paid by New York and never sought to have the United States recapture the tracts or their value for the Senecas. *Seneca Nation of Indians v. United States*, 173 Ct.Cl. 912 (1965) (Item 69, Exh. C).

The Senecas point out that the United States did not plead the defense of ratification, even though it was an affirmative defense which the ICC rules required to be pled in the government's answer (Item 82, at 17). The Senecas submit that the United States' failure to plead ratification as an affirmative defense constitutes a waiver of that defense. As a result, it argues that it did not brief the ratification defense in its brief to the ICC. In its decision, the ICC did not reach or even address the issue of ratification. Since the ICC had ruled against the Senecas on different grounds and the United States had not originally pled the defense, the Senecas assert that they did not brief the ratification issue in their brief to the Court of Claims (*Id.* at 18). A review of the briefs to the Court of Claims reveals that the United States raised the issue in its brief to the Court of Claims; however, the Senecas did not submit a reply brief arguing that because the briefing before the Court of Claims on this issue was one-sided, the issue was not "actually litigated" before the Court of Claims (*Id.*).

The State responds, saying that the Senecas were represented by counsel, and they were afforded a full opportunity to pursue discovery, present evidence, and engage in comprehensive briefing both before the ICC and the Court of Claims (Item 88, at 5). The State suggests that the Senecas' attorneys made the tactical decision not to present evidence and arguments on the ratification issue, and the Senecas should not now be able to avoid preclusive doctrines because of these poor tactical choices. Further, the State contends that the Senecas' argument that ratification was an affirmative defense

---

4. The Senecas assert that because the issue of whether the lands were actually appropriated was not actually litigated before the ICC or the Court of Claims, any findings of fact on that issue are merely dicta (Item 84, ¶ 9).

5. At that time, some courts had held that because New York State existed before there ever was a federal government, the Nonintercourse Act did not apply to the State. Today, there is no dispute that the Nonintercourse Act does apply to the State.

which the United States waived lacks merit (*Id.* at 7).

In the early 1980s, the New York State legislature passed laws authorizing conveyance of the disputed land. Chapter 263 of the New York State Laws of 1981, as amended by Chapter 644 of the Laws of 1983 and Chapter 596 of the Laws of 1987 (Item 71, ¶ 17; Item 112, ¶ 5). The Senecas assert that the State intends to sell and convey or lease the subject lands, which will in turn transfer title to the individual defendants (Item 71; ¶ 18; Item 112, ¶ 5). The Senecas contend that the sale or lease of these lands will cause irreparable injury and will leave them without any adequate remedy at law. As such, it seeks a permanent injunction preventing the defendants from selling, leasing, or otherwise conveying the subject lands. This claim forms the basis for Count IV in both the Senecas' and the United States' complaints.

In Count V of both the Senecas' and the United States' complaints, the parties allege that the acts of the individual defendants in taking possession of the Cuba Lake lots, that the Senecas claim lie all or in part on reservation land not appropriated by the State in 1858, constitute a trespass upon the Senecas' land. They seek damages for trespass and for profits the State made in leasing of the lots at issue. Finally, as to all Counts, the Senecas, joined in part by the United States, seek a declaration that the leases between the State and individual defendants to specified Cuba Lake lots are void, and an order ejecting all defendants from the disputed land (Item 58, at 17).

The State has asserted nine affirmative defenses to the Senecas' Second Amended Complaint (Item 51). The most significant of these defenses include: (1) the court lacks jurisdiction to adjudicate the claims because the Eleventh Amendment grants the State absolute immunity from such claims (Third Defense); (2) the present complaint should be dismissed under either the doctrine of res judicata or the doctrine of collateral estoppel (Fourth and Fifth Defenses); and (3) the United States consented to and ratified the State's "purchase" of the land (Sixth and Seventh Defenses). As for the remaining defenses, the Senecas and the United States have briefly responded to most of them; however, the State has not discussed them in its briefs.

The United States' complaint in intervention was just filed on July 13, 1998 (Item 125). The State has not yet filed an answer to it.

## DISCUSSION

### I. *The State's Eleventh Amendment Immunity*

■ Both the Senecas and the State devoted substantial portions of their initial briefs to the question of whether the Eleventh Amendment barred the Senecas' claims against the State. Since that time, the United States has intervened. The parties do not dispute that the entire Eleventh Amendment debate is academic as applied to the United States. The Eleventh Amendment, by its very terms, concerns only citizens of states and citizens of foreign states—not the United States. The Supreme Court in its most recent cases involving suits brought by Indian tribes against States in federal court have recognized that the United States is not barred by the Eleventh Amendment from bringing such a suit. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71 n. 14, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *see also Arizona v. California*, 460 U.S. 605, 614, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (quoting *United States v. Mississippi*, 380 U.S. 128, 140, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965)) ("[N]othing in the [Eleventh Amendment] has ever been seriously supposed to prevent a State's being sued by the United States.").

The State contends that the United States intervened only after the Supreme Court's decisions in *Seminole Tribe* and *Coeur d'Alene* as a last-ditch attempt to defeat State's sovereign immunity (Item 122). The State notes that the United States refused to bring an action against the State raising the Senecas' claims and that it declined to intervene when this suit had been filed by the Senecas. At oral argument, the United

States explained that it had participated in settlement negotiations between the State and the Senecas in the hope that they could broker a settlement without intervening in the litigation. The United States joined the action once it became apparent that its direct participation would be necessary. Accordingly, the court does not have to reach the many issues raised by the parties now that the United States has intervened.

■ If the court were to find that the Senecas' claims are barred by the State's Eleventh Amendment immunity, it would still be entitled to intervene in the United States' case. As the Senecas correctly point out, courts have regularly permitted Indian tribes to join or to intervene in cases brought by the United States against states, either as a matter of right under Fed.R.Civ.P. 24(a) or permissibly under Rule 24(b). *See, e.g., Nevada v. United States,* 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983); *Arizona,* 460 U.S. at 614–15, 103 S.Ct. 1382. In *Arizona,* the Supreme Court granted a motion to intervene made by several Indian tribes in an action over rights to the waters of the Colorado River brought by the United States. *Arizona,* 460 U.S. at 613, 103 S.Ct. 1382. The Court held that because the tribes did not seek to bring new claims or issues against the states, the federal courts' "judicial power over the controversy [wa]s not enlarged by granting leave to intervene, and the States' sovereign immunity protected by the Eleventh Amendment [wa]s not compromised." *Id.* at 614, 103 S.Ct. 1382.

The State does not challenge that the Senecas could intervene in the United States' claims if the court were to find that the Senecas' complaint itself was barred by the Eleventh Amendment, nor does it argue that the Senecas lack a sufficient interest to enable them to intervene in the United States' claims. Instead, the State reiterates that the Supreme Court's recent decisions make it clear that this court lacks jurisdiction to entertain the Senecas' claims, and the State contends that the United States' intervention does not alter this result (Item 122, at 5).

The State notes that in an unpublished oral decision, United States District Judge Neal P. McCurn in the Northern District of New York dismissed an Indian tribe's claims against the State even after the United States had intervened (*Id.,* at 5 and Attachment B (*Cayuga Indian Nation of New York v. Pataki* )). However, this court does not find the *Cayuga Nation* decision helpful because Judge McCurn did not discuss the ability of the tribe to intervene, and he only briefly mentioned the Eleventh Amendment issues. Furthermore, the tribe in *Cayuga Nation* did not raise the possibility of intervention or cite to *Arizona.* Instead, the tribe was content to allow the United States to represent it in the litigation. Here, as opposed to *Cayuga Nation,* the Senecas are not content to allow the United States alone to represent their interests in this litigation.

In *Mille Lacs Band of Chippewa Indians v. Minnesota,* 124 F.3d 904, 913 (8th Cir. 1997), *cert. granted,* — U.S. ——, 118 S.Ct. 2295, 141 L.Ed.2d 156 (June 8, 1998),[6] the United States intervened in a lawsuit commenced by bands of Indians. The Eighth Circuit affirmed the District Court's holding that because the United States and the Indian bands are seeking the same relief, and because the United States, as an intervenor, has the right to continue the suit even without the presence of the bands, the State's sovereign immunity is not compromised and the Eleventh Amendment does not bar the claims.

This court finds that this case strongly supports the Senecas' contention that they should be allowed to proceed in the present case. Even though the United States has only recently joined the present action, its participation is not new. The Eleventh Amendment protects a State from being hailed into federal court. Now that the United States is a plaintiff in the instant case, the State is properly before a federal court. The Senecas' and the United States' claims are virtually identical. Allowing the Senecas' claims to proceed does not further compromise the State's sovereign immunity. The

---

**6.** The Supreme Court granted *certiorari* on an issue other than the question of a state's Eleventh Amendment immunity.

interest of judicial economy is best served by allowing the Senecas' claims to continue.

## II. *Judicial Estoppel*

■ The State contends that the United States' claim founders on the doctrine of judicial estoppel (Item 122, at 6–9). As the Second Circuit explained in *Bates v. Long Island Railroad Co.*, 997 F.2d 1028, 1037 (2d Cir.), *cert. denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993) (internal citation omitted) (emphasis added):

> The doctrine of judicial estoppel prevents a party from asserting a *factual position* in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding. The doctrine has not been uniformly adopted by federal courts. . . .
>
> Unlike equitable estoppel, which is designed to ensure fairness in the relationship between parties, judicial estoppel protects the sanctity of the oath and the integrity of the judicial process.

In *Bates*, the Second Circuit defined the elements of judicial estoppel to include: (1) the party against whom judicial estoppel is asserted must have argued an inconsistent position in a prior proceeding, and (2) the prior inconsistent position must have been adopted by the court in some manner. *Id.* at 1038.

The State argues that both elements are satisfied in this case. In the ICC/Court of Claims action (hereinafter referred to as "*Seneca I* "), the United States argued that the 1927 Act constituted a congressional ratification of the acquisitions challenged in the instant litigation, and the court adopted this argument in its holding. The State contends that *Seneca I* was a final judgment from which no appeal was taken (Item 122, at 6). The State asks the court to broaden the doctrine of judicial estoppel to include inconsistent legal positions asserted by a party in successive actions.

The United States asserts that it is not taking an inconsistent position in the present action in light of the change in the legal standard for ratification announced by the Supreme Court in *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247–48, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) ("*Oneida II* "). In *Oneida II*, the Supreme Court held that only "plain and unambiguous" ratification will extinguish Indian title. *Id.* The United States argues that given this change in the law, its present position that Congress did not provide plain, unambiguous, and explicit ratification is not inconsistent with its previous argument in *Seneca I*. In *Seneca I*, the United States asserted that the 1927 Act demonstrated Congress' acquiescence in New York's acquisition of the land and that the Act was an implied ratification of that acquisition (Item 111, at 11–12 and Attachment A, at 49). The United States did not assert that the 1927 Act demonstrated plain, unambiguous, and explicit ratification of the State's acquisition. The United States relied upon case authority that held that implicit approval was sufficient for congressional ratification.

■ The State contends that the United States' bottom-line position in the 1965 litigation was that congressional ratification in fact was evidenced in the 1927 Act, and this ultimate legal and factual conclusion cannot be reconciled with the position that the United States urges in the present case (Item 122, at 6–7). The court does not agree with this conclusion. Judicial estoppel bars changes in factual positions. *Bates*, 997 F.2d at 1037. The United States' allegedly inconsistent statement was not so much a statement of fact, but rather a legal position. In *Seneca I*, the United States argued that under specified legal precedent the 1927 Act implicitly ratified the State's 1858 taking. In the current action, the United States argues that based on the same underlying facts, under *Oneida II*, the 1927 Act did not plainly or unambiguously ratify the taking. The court declines to extend the doctrine of judicial estoppel to include seemingly inconsistent legal positions. There is no legal authority for such a broadening of the doctrine. The State must rely on other preclusion doctrines to challenge a legal position.[7]

---

7. The State cannot circumvent the federal government's exemption from non-mutual collateral estoppel by trying to use the doctrine of judicial estoppel to challenge the United States' legal

■ Even if the doctrine of judicial estoppel applied to inconsistent legal positions, the Second Circuit has made it clear that "there must be a true inconsistency between the statements in the two proceedings. If the statements can be reconciled, there is no occasion to apply an estoppel." *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72–73 (2d Cir.1997). The change in the legal standard for congressional ratification enunciated in *Oneida II* and *United States v. Clarke*, 445 U.S. 253, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980), reconciles the change in the United States' legal position from almost twenty years earlier in *Seneca I*.

■ Furthermore, the United States correctly notes that the Second Circuit requires some evidence of misconduct by a party against whom judicial estoppel has been invoked. In *Young v. United States Department of Justice*, 882 F.2d 633, 639–40 (2d Cir.1989), *cert. denied*, 493 U.S. 1072, 110 S.Ct. 1116, 107 L.Ed.2d 1023 (1990), the Second Circuit intimated that there must be some evidence of an intent to mislead or to deceive the court before a court applies judicial estoppel to preclude a party's new claim. Here, the State does not argue that the United States has ever sought to mislead or to deceive the courts in either this litigation or in *Seneca I*, and the record does not reveal any such intent.

Based on the foregoing, the court finds that the doctrine of judicial estoppel does not bar the United States' complaint.

### III. *Res Judicata and Collateral Estoppel*

The State contends that the Senecas' claims are barred under the doctrines of res judicata and collateral estoppel since these very claims and the legal issues involved therein were already litigated in *Seneca I*.

### A. Res Judicata

■ Under the doctrine of res judicata, also known as claim preclusion, "a judgment on the merits in a prior suit bars a second suit involving the same parties or

their privies based on the same cause of action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). "Res judicata prevents the subsequent litigation of any defense or ground for recovery that was available to the parties in the original action, whether or not it was actually litigated or determined." *Tucker v. Arthur Andersen & Co.*, 646 F.2d 721, 727 (2d Cir.1981). Res judicata is not concerned with whether a prior judgment was right or wrong or whether subsequent changes in the law or considerations of fairness should merit a different result in the subsequent litigation. *Nemaizer v. Baker*, 793 F.2d 58, 64–66 (2d. Cir.1986). The doctrine is concerned with bringing an end to litigation after the parties have had a fair opportunity to litigate their claims.

■ In *Cayuga Indian Nation of New York v. Cuomo*, 667 F.Supp. 938, 947 (N.D.N.Y.1987) (*Cayuga II* ), the court held that because the ICC was created to resolve claims against the United States, the plaintiffs in that case could not have proceeded against non-federal defendants, at least those who did not derive title directly from the United States, in that forum. Therefore, the court held, res judicata did not bar the plaintiffs from bringing an action against non-federal defendants pursuant to 25 U.S.C. § 177 where the plaintiffs had brought a prior action against a federal defendant before the ICC. *Id.*

The State seeks to distinguish the *Cayuga II* holding from the present case, arguing that in *Cayuga II* the issue of federal government ratification was not raised before the ICC, it was not litigated, and it was not essential to the ICC's decision (Item 70, at 11). The State also argues that in *Cayuga II* the plaintiff received a favorable ruling from the ICC, and the defendants in that case argued that this precluded the subsequent Nonintercourse Act action for additional relief against defendants who were not parties to the ICC proceeding. In the present case, the decisions of the ICC and the Court of Claims were adverse to plaintiff. The State

position regarding the appropriate legal standard for ratification and the application of the same

facts to a revised legal standard.

argues that the Senecas should not be allowed to relitigate the very issue decided against them (*Id.* at 12).

Neither argument satisfactorily distinguishes *Cayuga II* from the present case. First, the *Cayuga II* court's discussion of ratification was in the context of its consideration of collateral estoppel and involved a different, and narrower, question than the one at issue here. *Cayuga II*, 667 F.Supp. at 948 ("The issue of federal government ratification was not before the ICC.... Thus, collateral estoppel does not bar this court's determination of the issue of federal government ratification of the conveyances."). Second, the disposition of a claim in favor of a particular party is not relevant to the preclusive effect of the claim in a subsequent suit.

The State also argues that although neither it nor its lessees were parties in *Seneca I*, they must be deemed as having been in privity with the federal government for res judicata purposes. The State argues that it had complete unity of interest with the United States which "strenuously advocated" that the 1927 Act constituted a ratification of the State's condemnation of the property at issue (Item 70, at 9–10). After responding to the Senecas' briefs, the State refined its position, arguing that the United States' litigation position in defense in *Seneca I* was a legal theory that inherently closely aligns the United States with the State for res judicata purposes (Item 88, at 4–5).

The Senecas correctly point out that although the definition of privity has been broadened to include relationships that may not have been previously contemplated,[8] even under its broadened scope, the State cannot be considered to have been in privity with the United States in *Seneca I*. Chapter 4 of the Restatement (Second) of Judgments, which is cited by the Supreme Court in *Richards v. Jefferson County*, 517 U.S. 793, 798–99, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996), sets out the circumstances in which non-parties may be in privity with parties to an action. These circumstances include: (1) persons who control the litigation (§ 39); (2) persons agreeing to be bound by the adjudication between others (§ 40); and (3) persons represented by a party (§ 41). Section 41 further sets out those circumstances in which a person who is not a party to an action is considered to be represented by a party and therefore entitled to the benefits of the judgment.[9] None of these circumstances existed between the State and the United States in *Seneca I*. Therefore, there is no basis on which the State can claim to be in privity with the United States in order to claim res judicata benefits from the 1965 Court of Claims decision.

There is no legal authority for the proposition that a similar or even identical litigation position is sufficient to align a new party with a party in an earlier litigation. The cases which the State has cited for the proposition that privity is a flexible concept do not support a finding of privity in this case (*See* Item 70, at 10–11). Most significantly, although the court in *Amalgamated Sugar Co. v. NL Industries, Inc.*, 825 F.2d 634, 640 (2d Cir.), *cert. denied*, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987), did consider whether the interests of the non-party were adequately represented in the initial action, the court clearly stated that

---

**8.** In *Richards v. Jefferson County*, 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996), the Supreme Court stated that "although there are clearly constitutional limits on the 'privity' exception, the term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of the term."

**9.** Section 41(1) provides, in relevant part:

A person who is not a party to an action but who is represented by a party is bound by and entitled to the benefits of a judgment as though he were a party. A person is represented by a party who is:

(a) The trustee of an estate or interest of which the person is a beneficiary; or
(b) Invested by the person with the authority to represent him in an action; or
(c) The executor, administrator, guardian, conservator, or similar fiduciary manager of an interest of which the person is a beneficiary; or
(d) An official or agency invested by law with authority to represent the person's interests; or
(e) The representative of a class of persons similarly situated, designated as such with the approval of the court, of which the person is a member.

568

such interests had to be represented "by another vested with the authority of representation" (citation omitted.) In *Seneca I*, the United States was never vested with the authority of representing the State.

The State relies on *Nevada*, 463 U.S. at 110, 103 S.Ct. 2906, and *Mashpee Tribe v. Watt*, 707 F.2d 23 (1st Cir.), *cert. denied*, 464 U.S. 1020, 104 S.Ct. 555, 78 L.Ed.2d 728 (1983), in which prior actions to adjudicate title to property were held to bar subsequent property actions by the same defendants and new, similarly situated defendants. *Seneca I* was an action for money damages for the alleged breach of the United States' fiduciary duty. It was not an action to quiet title, nor could it have been since the ICC and the Court of Claims lack jurisdiction over such an action. Thus, although some similar issues were brought up in *Seneca I*, that action was not "a comprehensive adjudication" of the true ownership of the land in question. Therefore, *Nevada* and *Mashpee* cannot be authority in the instant dispute because of the obvious lack of privity between the United States and the State discussed above.

Furthermore, two cases cited by the State at oral argument, *United States v. Pend Oreille Public Utility Dist. No. 1.*, 926 F.2d 1502 (9th Cir.), *cert. denied*, 502 U.S. 956, 112 S.Ct. 415, 116 L.Ed.2d 436 (1991) and *Western Shoshone Nat. Council v. Molini*, 951 F.2d 200, 202 (9th Cir.1991), *cert. denied*, 506 U.S. 822, 113 S.Ct. 74, 121 L.Ed.2d 39 (1992), are distinguishable from the case at bar and inapplicable. Both are cases in which the tribes first brought claims before the ICC for compensation for the taking of tribal lands and where the tribes challenged takings by the federal government or entities under their control (not by states). In order to determine whether the tribes were entitled to compensation, the ICC had to squarely address the question of whether Indian title had been extinguished. Therefore, because the history and the legal bases for *Pend Oreille* and *Western Shoshone* are different from the circumstances of the case at bar, the court finds that neither case is applicable.

**B. Collateral Estoppel**

 Collateral estoppel, or issue preclusion, bars a party from litigating an issue that was "actually litigated and necessary to the outcome" of a prior adjudication. *Parklane Hosiery*, 439 U.S. at 326 n. 5, 99 S.Ct. 645. The State argues that the Senecas should be estopped from asserting a claim that they have previously litigated and lost against another defendant, thereby invoking the defensive use of collateral estoppel. (Item 70, at 15, quoting *Parklane Hosiery*, 439 U.S. at 329, 99 S.Ct. 645). For collateral estoppel to apply:

(1) The issues in both proceedings must be identical; (2) the issue in the prior proceeding must have been actually litigated and actually decided; (3) there must have been a full and fair opportunity for litigation in the prior proceeding; and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir.1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987); *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir.1997).

The State argues that in *Seneca I* the Senecas were represented by counsel and were afforded a full opportunity to pursue discovery, present evidence, and engage in comprehensive briefing, both before the ICC and the Court of Claims (Item 88, at 5). The State notes that the United States expressly raised the argument that the 1927 Act constituted congressional ratification of the State's condemnation of the subject lands at oral argument before the ICC (*Id.*, Item 89, Exh. 4, at 18). The State contends that the tactical decision of the Senecas' attorneys not to respond to this argument cannot now be used to support its contention that it did not have a full and fair opportunity to litigate the issue in the first proceeding (Item 88, at 5–7).

 In *Conte v. Justice*, 996 F.2d 1398, 1401 (2d Cir.1993), the Second Circuit explained that "[u]nder New York law, an inquiry into whether a party had a full and fair opportunity to litigate a prior determination must concentrate on the various elements which make up the realities of litigation."

(citations omitted). The court further stated that:

> [f]actors listed by the New York Court of Appeals to assist in this inquiry include the forum for the prior litigation, the competence and experience of counsel, the foreseeability of future litigation, and the context and circumstances surrounding the prior litigation that may have deterred the party from fully litigating the matter.

*Id.*

Applying these factors to the instant case, the court agrees that the Senecas had a full and fair opportunity to litigate the ratification issue in *Seneca I*. The record shows that the United States did argue the ratification issue prior to the ICC's determination and again before the Court of Claims. No matter how the Senecas characterize it, their attorneys made the choice not to respond to these arguments or raise its waiver argument before the ICC or the Court of Claims. If there were defects in the United States' pleadings in the prior action, the proper forum for such an argument was the ICC or the Court of Claims, not this court approximately thirty years later. The Senecas cannot blame their silence on other parties. Both the ICC and the Court of Claims provided the Senecas with ample opportunity to present their arguments in both written and oral forms.

However, even though the court finds that the ratification issue was actually litigated and necessary to the Court of Claims' decision, the Senecas are correct in their contention that the circumstances of this case fit within one of the recognized exceptions to collateral estoppel. Because the court finds that two exceptions to collateral estoppel apply to the circumstances of this action, the Senecas' claims are not barred by collateral estoppel.

 First, the Senecas correctly point out that collateral estoppel is less favored when the issue to be precluded is a legal one, and least favored when it is one of statutory construction (Item 72, at 33). *United States ex. rel Stinson, Lyons, Gerlin and Bustamante, P.A. v. Blue Cross Blue Shield of Georgia,* 755 F.Supp. 1040, 1046 (S.D.Ga. 1990). As the Second Circuit has noted:

> Especially, where pure questions of law are presented, courts and commentators both have recognized that the interests of finality and judicial economy may be outweighed by other substantive policies, for in this circumstance "[t]he interests of courts and litigants alike can be protected adequately by the flexible principles of stare decisis."

*Haitian Centers Council Inc. v. McNary,* 969 F.2d 1350, 1356 (2d Cir.1992), (quoting 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4425, at 244 (1981)), *rev'd on other grounds,* 509 U.S. 155, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). Further, the Supreme Court has long recognized that " '[w]here ... a court in deciding a case has enunciated a rule of law, the parties in a subsequent action *upon a different demand* are not estopped from insisting that the law is otherwise.' " *Montana v. United States,* 440 U.S. 147, 162, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (quoting *United States v. Moser,* 266 U.S. 236, 242, 45 S.Ct. 66, 69 L.Ed. 262 (1924)).

 The State contends that this "unmixed questions of law" exception has been called into question by subsequent rulings, citing *United States v. Stauffer Chemical Company,* 464 U.S. 165, 171, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984) and *Clark–Cowlitz Joint Operating Agency v. F.E.R.C.,* 775 F.2d 366, 375 (D.C.Cir.1985), *judgment vacated by,* 787 F.2d 674 (D.C.Cir.1986). Both *Stauffer* and *Clark–Cowlitz,* however, involved subsequent actions involving the same parties. Thus, the courts found that in cases where the same parties had already litigated the same purely legal questions, the unmixed questions of law exception to collateral estoppel should not apply. In the present case, we have a different defendant and a different legal demand. The claims at issue in this case, to quiet title and for ejectment, were not and could not have been asserted before the ICC or Court of Claims. The present defendants have not argued this issue before and won a favorable ruling; therefore, it is not unfair to force them to litigate this issue here.

Second, the United States cannot be barred from litigating the ratification issue in the instant litigation. In *United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), the Supreme Court held that nonmutual collateral estoppel (where the parties in the first action are not the same as the parties in the second action, and the party who seeks to preclude a party from relitigating an issue was not a party in the first action) could not be applied against the United States government. The Court explained that "[a] rule allowing nonmutual collateral estoppel against the Government ... would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue." *Id.* at 160, 104 S.Ct. 568. The Court emphasized the importance of enabling the government to change its policies, stating that "the panoply of important public issues raised in government litigation may quite properly lead successive administrations of the Executive Branch to take differing positions with respect to the resolution of a particular issue." *Id.* at 161, 104 S.Ct. 568. The Supreme Court recently reaffirmed its holding that nonmutual collateral estoppel does not apply where the United States is the party sought to be precluded from relitigating an issue. *United States v. Alaska*, 521 U.S. 1, 117 S.Ct. 1888, 1896, 138 L.Ed.2d 231 (1997). Since the defendants in the instant action were not parties to *Seneca I* they cannot assert collateral estoppel against the United States in the present action.

When the State and the Senecas first briefed this exception to collateral estoppel, the United States had not yet intervened in this action. The Senecas sought an extension of this exception to include those situations where the United States could, yet had not, brought a suit on behalf of a private party. In effect, the Senecas wished to step in the shoes of the United States for purposes of this exception to collateral estoppel simply because the United States could have brought this suit on the Senecas' behalf. Because the United States has since intervened, the court does not have to rule on the Senecas' request for an extension of the exception. The United States' complaint in intervention is virtually identical to the Senecas' Second Amended Complaint, making the same claims and seeking the same relief. As a practical matter, because the United States is not barred from relitigating the ratification issue and because the United States can litigate the issue on the Senecas' behalf, it makes no difference whether the Senecas are barred from relitigating the issue. The United States has adopted most of the Senecas' arguments regarding the ratification issue; therefore, the Senecas' arguments will be considered in the very least indirectly.

## IV. *The Seneca Nation's and the United States' Nonintercourse Act Claims*

Both the Senecas and the United States contend that they are entitled to judgment as a matter of law on their Nonintercourse Act claims. Under 25 U.S.C. § 177, any conveyance by an Indian tribe not made pursuant to a treaty or convention under the federal constitution is "void *ab initio*." *Oneida II*, 470 U.S. at 245, 105 S.Ct. 1245.

To establish a violation of the Nonintercourse Act, a plaintiff must show that:

(1) it is or represents an Indian "tribe" within the meaning of the Act; and

(2) the parcels of land at issue herein are covered by the Act as tribal land; and

(3) the United States has never consented to the alienation of the tribal land; and

(4) the trust relationship between the United States and the tribe, which is established by coverage of the Act, has never been terminated or abandoned.

*Oneida Indian Nation of New York v. County of Oneida*, 434 F.Supp. 527 (N.D.N.Y. 1977), aff'd, 719 F.2d 525 (2d Cir.1983), aff'd part, rev'd in part, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985). The only element that the State challenges is whether the United States consented to the disputed land acquisition. This is the very issue that the Senecas and the United States litigated in *Seneca I* which the court has found is not barred by collateral estoppel.

The State contends that the 1927 Act ratified the conveyance because it referred to lands "heretofore acquired by the State of

New York by condemnation proceedings" (Item 85, at 3–5). The United States has adopted the evidence and arguments of the Senecas, and it asserts that it did not give its consent or approval to the conveyance by treaty (Item 111, at 5 and n. 3). There is no question that the United States did not consent to the appropriation by treaty or convention, as required by the Nonintercourse Act. The State admits that the 1858 appropriation and subsequent possessions were not consented to contemporaneously by the United States (Item 73, Exh. 12, ¶ 11). Thus, the consent element of the Senecas' claim has been met.

However, the State has raised the affirmative defense of ratification. The Senecas and the United States contend that under the standards established in *Oneida II,* the 1927 Act does not constitute congressional ratification of the disputed acquisitions. In *Oneida II,* the Supreme Court held that only " 'plain and unambiguous' " ratification will extinguish Indian title. *Oneida II,* 470 U.S. at 248, 105 S.Ct. 1245 (quoting *United States v. Santa Fe Pacific R. Co.,* 314 U.S. at 346, 62 S.Ct. 248). In *Oneida II,* two federal treaties described lands to be ceded by the Oneidas and, in doing so, referred to a prior conveyance by the Oneidas to the State of New York. Petitioners in *Oneida II* claimed that the language "all the lands . . . from the northeastern corner of lot No. 54 in the last purchase from them . . ." and ". . . to their lands heretofore ceded by the said Oneida nation of Indians to the People of the State of New York" demonstrated ratification by the United States of the prior sales to New York. *Oneida II,* 470 U.S. at 247–48, 105 S.Ct. 1245. The Supreme Court rejected this argument outright and stated: "The language cited by petitioners, a reference in the 1798 treaty to 'the last purchase' and one in the 1802 treaty to 'land heretofore ceded,' far from demonstrates a plain and unambiguous intent to extinguish Indian title." *Id.* at 248, 105 S.Ct. 1245.

▮ In addition, after *Oneida II,* courts in this circuit have rejected the argument that implicit congressional ratification will satisfy the requirements of the Nonintercourse Act. *See Cayuga II,* 667 F.Supp. at

945 (held that ratification "must be plain and unambiguous, as well as explicit").

▮ Once again, the 1927 Act states in relevant part:

[T]he laws of the State of New York (including laws hereafter enacted) relating to the taking of game and fish shall be applicable to the taking of game and fish within the Allegany, Cattaraugus, and Oil Spring Indian Reservations in the State of New York; except that—. . .

(3) . . . this Act shall be inapplicable to lands formerly in the Oil Spring Reservation and heretofore acquired by the State of New York by condemnation proceedings.

Act of Jan. 5, 1927, Ch. 22, 44 Stat. 932 (Item 73, Exh. 15). The Senecas and the United States argue that the reference to Oil Spring Reservation land in subsection (3) of the 1927 Act was merely meant to identify and except the particular parcel of land from a broad-sweeping hunting and fishing rights provision, thereby serving as a savings clause preserving the status quo. They argue that this exception to a hunting and fishing law cannot amount to a ratification of the State's prior appropriations of land in the Oil Spring Reservation (Item 72, at 17; Item 111, at 8).

▮ The Senecas and the United States further argue that the legislative history of the 1927 Act shows that there was no intent to ratify the acquisitions. Most significant is a statement made by Congressman Reed of New York, the bill's sponsor, in which he explained that:

[The House and Senate bills] are identical with the exception that there is an amendment in the Senate bill that excepts certain property which was condemned by the State of New York. That is all.

\*\*\*

The Senate bill is identical with the exception that there is an amendment in the Senate bill. . . . [T]he only difference is that some years ago the State of New York condemned certain lands for canal purposes, and the amendment in the Senate bill is simply to except those lands from this measure. That is all.

(Item 73, Exh. 18). "As a statement of one of the legislation's sponsors, this explanation deserves to be accorded substantial weight in interpreting the statute." *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976).

The Senecas contend that this statement shows that Congress did not intend to ratify the prior taking through the 1927 Act. The purpose of the subsection (3) was "simply to except those lands from this measure." (Item 72, at 19). The United States adds that the Department of the Interior addressed this very issue in a letter to Congressman Reed in June 1926 when it wrote: "It is not the intention of this Office to recognize title to the land as being in the state or in the Indians by reason of this proposed amendment." (Item 111, at 10 n. 5).

The Senecas and the United States also point out that the same session of Congress that passed the 1927 Act passed another statute which expressly ratified a transfer of a different tract of land within the Oil Spring Reservation to the State. That Act provided, in pertinent part:

> That a certain instrument of conveyance dated December 30, 1927, from the Seneca Nation of Indians to Seneca Oil Spring Association (Incorporated), granting by quitclaim title a tract of land having a radius of seventy-five feet from the center of the oil spring located on the Oil Spring Reservation, New York, and a right of way . . . is hereby confirmed and the approval of the Assistant Secretary of the Interior Department of February 28, 1928, thereof is hereby validated.

Act of May 22, 1928, Ch. 691, 45 Stat. 1857 (described in Item 72, at 19–20). The Senecas and the United States contend that this legislation shows that Congress knew how to expressly ratify a transfer of Oil Spring lands, and it is entitled to "great weight" in interpreting the 1927 Act.

The 1927 Act cannot be viewed as a plain, unambiguous, and explicit ratification of the State's acquisition of Oil Spring land. The language of the statute itself is ambiguous on its face. Although the statute clearly refers to land on the Oil Spring Reservation that was condemned by the State, the reference does not suggest that Congress was making any finding as to who currently held title to that land. Further, the legislative history reveals that Congress merely intended to except the described lands from the hunting and fishing measure announced by the Act. In addition, the letter from the Department of the Interior to Congressman Reed shows that the United States government understood that any reference to the land might raise the question of congressional ratification of the State's acquisition and that the Department of the Interior did not intend for the Act to make any judgment on the question of title. Finally, the 1928 Act ratifying the transfer of a different parcel of land in the Oil Spring Reservation to the State demonstrates that Congress understood its power to ratify transfers of Indian land and that when it intended to ratify a transfer, it did so explicitly. The 1927 Act did not state that it "ratified", "confirmed", or "approved" the acquisition, words that Congress used in other legislation that actually ratified land transfers.

Accordingly, because the 1927 Act did not ratify the State's acquisitions of the disputed lands, the court finds that these acquisitions violated the Nonintercourse Act as a matter of law.

## V. *The State's Other Affirmative Defenses*

The State asserted several additional affirmative defenses in its answer to the Senecas' Second Amended Complaint (Item 59). The parties did not thoroughly brief these remaining defenses, nor did they present arguments during oral argument. The court finds that each of the defenses is insufficient as a matter of law and therefore can be dismissed at this time.[10]

### A. Laches

 In its answer, the State asserts that the Senecas' claims are barred by the federal

---

10. In addition to the following three defenses, the State asserted that the Senecas have not stated a claim upon which relief can be granted

(Item 59). This defense is clearly inappropriate under *Oneida II*, 470 U.S. at 233, 105 S.Ct. 1245, and the foregoing discussion.

common law defense of laches (Item 59, ¶ 18). However, in *Oneida II*, the Supreme Court indicated that the application of laches to an Indian land claim would be novel and contrary to earlier decisions of the Court. *Oneida II*, 470 U.S. at 244 n. 16, 105 S.Ct. 1245. Further, in *Oneida Indian Nation of New York v. State of New York*, 691 F.2d 1070, 1084 (2d. Cir.1982) ("*Oneida Nation*"),[11] the Second Circuit rejected all "delay-based defense[s] founded on federal law." The court held that "at the very least suits by tribes should be held timely if such suits would have been timely if brought by the United States," and that since the action in question in that case would not have been barred by the applicable statute of limitations, it should not be barred by laches. *Id.*

This suit is brought to quiet title in land, for ejectment, and for trespass. Title 28 U.S.C. § 2415(c) provides that there is no limitations period for suits for possession or title brought by the United States. Title 28 U.S.C. § 2415(b) provides that Indian claims that are on a list published by the Secretary of the Interior pursuant to section 4(c) of the Indian Claims Limitations Act of 1982 are not barred until (1) one year after the Secretary publishes, in the Federal Register, a rejection of the claim, or (2) three years after the Secretary submits legislation to Congress to revoke the claim. The present claim was listed by the Secretary in the Federal Register on March 31, 1983 (Item 73, Exh. 20), but it has never been rejected, nor has the Secretary submitted legislation to revoke the claim. Thus, the claim was timely when the United States recently intervened.

## B. Political Question Doctrine

 In *Oneida II*, the Supreme Court rejected the political question defense to Nonintercourse Act claims. *Oneida II*, 470 U.S. at 249, 105 S.Ct. 1245. The Court found no "unusual need for unquestioning adherence to a political decision already made," and consequently found the claim justiciable. *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). The basis for the defendants' claim in *Oneida II* was the fact that the Commissioner of Indian

Affairs had declined to bring an action on behalf of the Indian tribe with respect to the claims' being litigated in *Oneida II*.

In *Oneida Nation*, the Second Circuit stated that "adjudication of Indian land claims such as the instant action is wholly consistent with the prevailing conceptions of the relationship among the three branches of government concerning the appropriate means to redress the historical wrongs committed against the Native American." *Oneida Nation*, 691 F.2d at 1081. The court further observed that "to [their] knowledge no Indian land claim has ever been dismissed on nonjusticiability grounds." *Id.*

Based on the foregoing, the court rejects the State's political question defense.

## C. Election of Remedies Doctrine

 In *Cayuga II*, the Northern District of New York rejected the election of remedies defense on a prior Indian Claims Commission action. *Cayuga II*, 667 F.Supp. at 946. The court explained that the doctrine is given little, if any, validity in federal practice, and that it is a harsh doctrine that is not favored. *Id.* In order for the doctrine to apply, there must be: (1) the existence of two or more remedies; (2) the inconsistency of such remedies; and (3) a choice of one of them. *Id.* (citing *Davis v. Rockwell International Corp.*, 596 F.Supp. 780, 787 (N.D.Oh. 1984)).

 The *Cayuga II* court held that:

[A]ny conveyance of land in contravention of the dictates of the Nonintercourse Act is invalid, as if it did not occur at all....

Therefore, even if the doctrine of election of remedies were generally accepted in federal practice, which it is not, the court concludes that it is inapplicable here. Neither plaintiff was afforded a true choice of remedies as the receipt of additional consideration is no remedy at all for an invalid conveyance of land. The court thus finds no merit to the defendants' argument

---

11. This case is not directly related to the *Oneida* *II* line of cases.

based on the doctrine of election of remedies.

*Cayuga II,* 667 F.Supp. at 946.

There is no dispute that the Senecas could not seek the equitable remedies that they seek in the present action. They could only seek money damages and thus were not given a true choice of remedies. Although *Cayuga II* is not binding authority, this court finds the reasoning to be persuasive and rejects the State's election of remedies defense.

## CONCLUSION

For the foregoing reasons, the court grants the Seneca Nation's and the United States' motion for summary judgment (Items 67, 68, and 110) and denies the State's motion for summary judgment (Item 69).

Having found as a matter of law that the State violated the Nonintercourse Act when it acquired the disputed Oil Spring lands, the court has determined the general question of liability. Nevertheless, there still remain questions of the precise land at issue and the appropriate remedies. Accordingly, a telephone conference is scheduled for November 17, 1998, at 3:30 p.m. when the court will discuss with the parties how to proceed.

So ordered.